**MASHANTUCKET PEQUOT TRIBE,**
**Plaintiff–Appellee,**

v.

**STATE OF CONNECTICUT and William A. O'Neill, Governor of the State of Connecticut, Defendants–Appellants.**

**No. 1841, Docket 90–7508.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1990.

Decided Sept. 4, 1990.

Richard M. Sheridan, Asst. Atty. Gen. of the State of Conn., (Clarine Nardi Riddle, Atty. Gen. of the State of Conn., Robert F.

Vacchelli, Carolyn Querijero, Asst. Attys. Gen., Hartford, Conn., of counsel), for defendants-appellants.

Barry A. Margolin, Portland, Me. (Robert L. Gips, Gregory W. Sample, Tureen & Margolin, Portland, Me., Jackson T. King, Brown, Jacobson, Jewett & Laudone, Mystic, Conn., of counsel), for plaintiff-appellee.

Richard B. Stewart, Asst. Atty. Gen. of the U.S. (Carol J. Williams, Blake A. Watson, Attys., Dept. of Justice, Washington, D.C., Michael Cox, Dept. of Interior, Washington, D.C., of counsel), for the U.S., amicus curiae.

Robert K. Corbin, Atty. Gen. of the State of Ariz. (Ian A. Macpherson, Phoenix, Ariz., of counsel), for the states of Ariz. and Nev., amici curiae.

Donald J. Simon, Washington, D.C. (Sonosky, Chambers & Sachse, Washington, D.C., Jerome L. Levine, Neiman, Billet, Albala & Levine, Los Angeles, Cal., James E. Townsend, Minneapolis, Minn., of counsel), for Nat. Indian Gaming Ass'n, amicus curiae.

Before WINTER, MAHONEY, and WALKER, Circuit Judges.

MAHONEY, Circuit Judge:

The Indian Gaming Regulatory Act ("IGRA")[1] establishes three classes of gaming activity. The Mashantucket Pequot Tribe (the "Tribe") seeks to operate casino-type games of chance on its reservation located in Ledyard, Connecticut (the "Reservation"). The contemplated games are class III gaming activities, which are allowed only in conformance with a tribal-state compact. Accordingly, the Tribe requested that the State of Connecticut enter into negotiations with the Tribe concerning the formation of a compact. The state refused to negotiate, and when no compact had been completed more than 180 days after the request to negotiate, the Tribe filed this action against the State of Connecticut and Governor William A. O'Neill (collectively the "State") in the United States District Court for the District of

Connecticut pursuant to 25 U.S.C. § 2710(d)(7) (1988). The Tribe sought (1) an order directing the State to conclude within sixty days a tribal-state compact with the Tribe governing the conduct of gaming activities on the Reservation, pursuant to section 2710(d)(7)(B)(iii), and appointing a mediator to resolve any impasse in accordance with section 2710(d)(7)(B)(iv); and (2) a declaratory judgment that the IGRA obliges the State to negotiate in good faith with the Tribe regarding the conduct of gaming activities on the Reservation.

Both sides moved for summary judgment. Agreeing with the Tribe that the only precondition to the State's obligation to negotiate is a request by the Tribe to negotiate in accordance with section 2710(d)(3)(A), the district court 737 F.Supp. 169 granted summary judgment to the Tribe directing the State to enter into good faith negotiations with the Tribe, and directing that the State and the Tribe conclude a tribal-state compact within sixty days.

We affirm.

*Background*

The IGRA declares its primary purpose to be the provision of "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." § 2702(1). Its enactment followed court decisions upholding the right of tribes to conduct public bingo games on Indian lands. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987); *Barona Group of Capitan Grande Band of Mission Indians v. Duffy,* 694 F.2d 1185 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Seminole Tribe v. Butterworth,* 658 F.2d 310 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Mashantucket Pequot Tribe v. McGuigan,* 626 F.Supp. 245

---

1. The IGRA was enacted by Pub.L. No. 100-497, 102 Stat. 2467 (1988), and is codified at 25 U.S.C. §§ 2701-2721 (1988) and 18 U.S.C. §§ 1166-1168 (1988).

(D.Conn.1986); *Oneida Tribe of Indians v. Wisconsin*, 518 F.Supp. 712 (W.D.Wis. 1981).

The IGRA establishes three classes of gaming, which are subject to differing degrees of tribal, state, and federal jurisdiction and regulation. Class I gaming is limited to social games for nominal prizes and traditional tribal ceremonial games, § 2703(6), and is subject only to tribal regulation, § 2710(a)(1). Class II gaming includes bingo and related games, as well as certain nonbanking card games.[2] § 2703(7)(A). Banking card games, electronic games of chance, and slot machines are expressly excluded, § 2703(7)(B), but certain banking card games operated by Indian tribes in certain states on or before May 1, 1988 may be grandfathered as class II gaming, § 2703(7)(C). Class II gaming is generally not subject to state regulation,[3] but is subject to some federal oversight by the National Indian Gaming Commission ("NIGC"), § 2710(b) and (c), in addition to tribal regulation, § 2710(a)(2). All other forms of gaming are classified as class III gaming. § 2703(8).

Under section 2710(d)(1), class III gaming activities are lawful on Indian lands only if such activities are:

(A) authorized by an ordinance or resolution that—

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b) of this section, and

(iii) is approved by the Chairman [of the NIGC],[4]

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) [of section 2710(d)] that is in effect.

25 U.S.C. § 2710(d)(1) (1988). A tribal-state compact is "in effect" when "notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register." § 2710(d)(3)(B). In sum, class III gaming activities are subject to tribal and state regulation, as provided by a tribal ordinance, a tribal-state compact, and the IGRA.

The Tribe sought to expand its gaming activities to include class III games of chance, such as those activities permitted by Connecticut law for certain nonprofit organizations during "Las Vegas nights." Conn.Gen.Stat. §§ 7–186a to 7–186p (1989).[5] Accordingly, counsel for the Tribe wrote a letter dated March 30, 1989 to the governor of Connecticut, William A. O'Neill, "to request that the State of Connecticut enter into negotiations with the Tribe for the purpose of entering into a Tribal–State compact governing the conduct of expanded gaming activities on the Tribe's reserva-

---

**2.** "The distinction is between those games where players play against each other rather than the house [(nonbanking card games, *e.g.*, poker)] and those games where players play against the house and the house acts as banker [(banking card games, *e.g.*, blackjack)]." S.Rep. No. 446, 100th Cong., 2nd Sess. 9, *reprinted in* 1988 U.S. Code Cong. & Admin.News 3071, 3079 ("Senate Report").

**3.** Class II gaming may be conducted, however, only "within a State that permits such gaming for any purpose by any person, organization or entity," § 2710(b)(1)(A), and "[a] tribal ordinance or resolution may provide for the licensing or regulation of class II gaming activities owned by any person or entity other than the Indian tribe and conducted on Indian lands, only if the tribal licensing requirements ... are at least as restrictive as [applicable] State law

governing similar gaming," § 2710(b)(4)(A). In addition, nonbanking card games permitted as Class II gaming must be "played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games." § 2703(7)(A)(ii).

**4.** The first chairman of the NIGC was confirmed by the United States Senate on May 26, 1990.

**5.** The games of chance that Connecticut permits at the "Las Vegas nights" include blackjack, poker, dice, money-wheels, roulette, baccarat, chuck-a-luck, pan game, over and under, horse race games, acey-ducey, beat the dealer, and bouncing ball. *See* Division of Special Revenue, Administrative Regulations: Operation and Conduct of Games of Chance § 7–186k–15 (1988).

tion in Ledyard [, Connecticut]." By letter dated May 1, 1989, Governor O'Neill responded that he had requested that the State's Acting Attorney General, Clarine Nardi Riddle, review the IGRA and determine the State's obligations thereunder.

By letter dated July 19, 1989, Acting Attorney General Riddle advised the Tribe that the State would not negotiate concerning the operation of games of chance or "Las Vegas nights" on the reservation, since the Tribe only had a "right to conduct 'Las Vegas Nights' on the premises of the reservation subject ... to those restrictions contained in the Connecticut General Statutes (§ 7–186a, et seq.) and the regulations of the Division of Special Revenue which are generally applicable to those groups authorized to conduct such a form of entertainment." The letter also stated that the State was willing "to negotiate, in good faith, with the Tribe, concerning other permissible forms of gaming in Connecticut," and that Governor O'Neill would "shortly be appointing a task force or negotiating team specifically for this purpose."

By letter dated August 1, 1989, counsel for the Tribe expressed to Acting Attorney General Riddle their pleasure "to hear of the impending appointment of a negotiating team for the State, and [their] hope to meet with [the] negotiating team as soon as possible," while soliciting an expression of the legal analysis underlying the State's view that it was under no obligation to negotiate concerning class III gambling. Responding by letter dated August 23, 1990, Acting Attorney General Riddle offered additional arguments for the State's position, discussed the State's amenability to litigation to resolve the issue, and raised the question whether the Tribe had enacted a gaming ordinance. Despite the State's asserted "readiness to resolve the issue of casino type gambling" on the Reservation, however, prior to this litigation the State never entered into actual negotiations with the Tribe, nor was the Tribe ever advised of the appointment of any negotiating committee by the State.

Section 2710(d)(7)(B)(i) authorizes an Indian tribe to commence an action in district court against a state for failure to negotiate if a 180–day period has elapsed since the tribe requested that the state enter into negotiations. On November 3, 1989, after more than 200 days had elapsed since the Tribe requested negotiations, the Tribe filed its complaint in this action in the United States District Court for the District of Connecticut, invoking jurisdiction under section 2710(d)(7)(A)(i).

On January 25, 1990, the Tribe moved for summary judgment: (1) declaring that the State is required by the IGRA to negotiate with the Tribe concerning the terms of operation of games of chance on the Reservation, including any rules concerning prizes, wagers and frequency; (2) ordering the State and Tribe to conclude a tribal-state compact governing gaming activities on the Reservation within sixty days pursuant to section 2710(d)(7)(B)(iii); and (3) ordering the appointment of a mediator to resolve any impasse in accordance with section 2710(d)(7)(B)(iv)–(vii).

The State cross-moved for summary judgment on February 23, 1990. The State contended that the district court lacked jurisdiction because the Tribe had not yet adopted a tribal ordinance permitting casino-type gambling on the Reservation, which in the State's view was required by section 2710(d)(1)(A) as a prerequisite to any obligation to negotiate. The State also argued that no comparable class III gaming activity was permitted in the state, as required by section 2710(d)(1)(B).

The Tribe contended that the only precondition to negotiation was a request to negotiate in accordance with section 2710(d)(3)(A), which had been made, and that because the State permitted certain non-profit organizations to conduct "Las Vegas nights," the games of chance the Tribe desired were generally permitted, albeit regulated, within the meaning of section 2710(d)(1)(B).

On May 15, 1990, the district court granted summary judgment in favor of the Tribe and denied the State's cross-motion. The court ordered the State to "enter into good faith negotiations with the Tribe for the purpose of formulating a Tribal–State com-

pact governing the conduct of games of chance defined in Conn.Gen.Stat. § 7–186a, *et seq.,* on its reservation," and ordered further that the State and the Tribe conclude a tribal-state compact within sixty days of the ruling, in accordance with section 2710(d)(7)(B)(iii). The State appealed to this court on May 25, 1990.

On June 5, 1990, the district court modified its judgment, pursuant to Fed.R.Civ.P. 62(c), to provide that the deadline for conclusion of the Tribal–State compact was extended to within sixty days of June 5, 1990. The district court denied, however, appellants' motion for a stay pending appeal to this court. On June 14, 1990, this court also denied a motion for a stay of the district court order pending appeal, but ordered that the appeal be expedited. At oral argument, this court denied the State's renewed motion to stay the order to negotiate pending the outcome of this appeal, as well as the State's alternative motion that the sixty-day negotiation period be renewed. On August 14, 1990, the district court approved the parties' joint request to extend the negotiation period, setting a new deadline of September 21, 1990.

### Discussion

A. The State's Obligation to Negotiate.

■ The State first contends that no obligation to negotiate a compact has yet arisen, because the Tribe has not adopted a tribal ordinance that has been approved by the chairman of the NIGC and authorizes the conduct of Class III gaming on the Reservation, as required by subparagraph (A) of section 2710(d)(1), and the adoption of such an ordinance is a precondition to the State's obligation to negotiate a tribal-state compact regarding class III gaming. We disagree.

Section 2710(d)(1) on its face lists several conditions that must be satisfied before a tribe can lawfully engage in class III gaming. Although the adoption of an appropriate tribal ordinance is the first requirement set forth in section 2710(d)(1), nothing in that provision requires sequential satisfaction of its requirements, nor does its legislative history suggest that a tribal ordi-

nance must be in place before a state's obligation to negotiate arises. Indeed, section 2710(d)(2)(C) provides that effective with the publication of a tribal ordinance in the Federal Register, "class III gaming activity on the Indian lands of the Indian tribe shall be fully subject to the terms and conditions of the Tribal–State compact entered into under paragraph (3) of the Indian tribe *that is in effect"* (emphasis added), thus suggesting that the consummation of the compact will *precede* enactment of the tribal ordinance.

Moreover, the IGRA plainly requires a state to enter into negotiations with a tribe upon request. Section 2710(d)(3)(A) provides:

Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, *shall request* the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities. *Upon receiving such a request, the State shall negotiate* with the Indian tribe in good faith to enter into such a compact.

*Id.* (emphasis added). Further, the IGRA permits a tribe to initiate an action upon the state's failure to negotiate, after a waiting period timed from the date of the request. *See* § 2710(d)(7)(B). Thus, the only condition precedent to negotiation specified by the IGRA is a request by a tribe that a state enter into negotiations.

Finally, the State's argument that the adoption of a tribal ordinance must occur first among the three conditions specified in section 2710(d)(1) because it is listed first (in subparagraph (A)) encounters the obstacle that the condition which is listed second (in subparagraph (B)) will, of necessity, preexist and precede the adoption of a tribal ordinance. Subparagraph (B) requires that the proposed gaming activities be "located in a State that permits such gaming for any purpose by any person, organization, or entity." Obviously, if a state does not permit "such gaming," the

matter is at an end, and the adoption of a tribal ordinance will never occur.

For all the foregoing reasons, the district court correctly concluded that the State was required to negotiate with the Tribe upon request.

### B. Gaming Activities Subject to Negotiation.

■ The State next contends that the class III gaming as to which the Tribe seeks to negotiate is not gaming that the State "permits ... for any purpose by any person, organization, or entity" within the meaning of section 2710(d)(1)(B). Specifically, the State argues that its limited authorization of the conduct of "Las Vegas nights" by nonprofit organizations does not amount to a general allowance of "such [casino-type] gaming," within the contemplation of section 2710(d)(1)(B), as the Tribe would institute; and further that such gaming activity is contrary to the State's public policy. Thus, the State urges, since the condition of subparagraph (B) of section 2710(d)(1) has not been satisfied, the State is not obligated to negotiate the tribal-state compact envisioned by subparagraph (C).

Pursuant to Conn.Gen.Stat. §§ 7–186a to 7–186p (1989), the State sanctions "Las Vegas nights" conducted by "[a]ny nonprofit organization, association or corporation." § 7–186a(a) and (b). Such entities "may promote and operate games of chance to raise funds for the purposes of such organization, association or corporation," § 7–186a(b), subject to specified conditions and limitations as to, *inter alia*, the status of the sponsoring organization, size of wagers, character of prizes, and frequency of operations. The district court concluded that the games of chance that the Tribe seeks to conduct constitute "such gaming" as is permitted by Connecticut law at "Las Vegas nights," and that the Tribe's contemplated activities therefore constituted permissible class III gaming activities in the State. In our view, the district court correctly decided the issue.

At the outset, we note the congressional "find[ing]," set forth in section 2701(5),

that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." This declaration is consistent with the Supreme Court's pre-IGRA ruling in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987):

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within [the area] of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory.... The shorthand test is whether the conduct at issue violates the State's public policy.

*Id.* at 209, 107 S.Ct. at 1088.

Further, the Senate Report specifically adopted the *Cabazon* rationale as interpretive of the requirement in section 2710(b)(1)(A) that class II gaming be "located within a State that permits such gaming for any purpose by any person, organization or entity," declaring (under the heading "Statement of Policy"):

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in %iCabazon.

Senate Report at 6, U.S.Code Cong. & Admin.News 1988, 3076; *see also United States v. Sisseton–Wahpeton Sioux Tribe*, 897 F.2d 358, 365 (8th Cir.1990) (as to section 2710(b)(1)(A) and class II gaming, "the legislative history reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity.").

We deem this legislative history instructive with respect to the meaning of the identical language in section 2710(d)(1)(B), regarding class III gaming, which we must interpret.[6] "It is a settled principle of statutory construction that '[w]hen the same word or phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in the next place.'" *United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.) (quoting *Meyer v. United States*, 175 F.2d 45, 47 (2d Cir.1949) (quoting *Lewellyn v. Harbison*, 31 F.2d 740, 742 (3d Cir.1929))), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978). Although the State correctly points out that this rule has its exceptions, none advanced by the State has any pertinence here.

The State nonetheless contends that the *Cabazon* criminal/prohibitory-civil/regulatory dichotomy should not be employed here, citing *United States v. Dakota*, 796 F.2d 186, 188–89 (6th Cir.1986), and *United States v. Burns*, 725 F.Supp. 116 (N.D.N.Y. 1989), *appeal pending sub nom. United States v. Cook* (2d Cir. Nos. 90–1070, –1072, –1168, and –1179. *Dakota*, however, was a pre-IGRA case which ruled only "that the criminal/prohibitory-civil/regulatory test is inappropriate to an interpretation of 18 U.S.C. § 1955 [a provision of the Organized Crime Control Act of 1970]." 796 F.2d at 187–88; *see also Cabazon*, 480 U.S. at 213, 107 S.Ct. at 1090 (construing *Dakota*). *Dakota* added that (unlike the IGRA): "18 U.S.C. § 1955 was not enacted for the benefit of Indian tribes." 796 F.2d at 188. *Burns*, like *Dakota*, involved the application of the *Cabazon* test to 18 U.S.C. § 1955 (1988). *See* 725 F.Supp. at 126.

The State's position, furthermore, is in direct opposition to the central premise of the IGRA with respect to class III gaming. The heart of the ultimate legislative compromise regarding class III gaming was described in these terms:

> After lengthy hearings, negotiations and discussions, the Committee concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises such as pari-mutuel horse and dog racing, casino gaming, jai alai and so forth. The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for setting [sic] various matters between two equal sovereigns.

Senate Report at 13, U.S.Code Cong. & Admin.News 1988, 3083.

The compact process is therefore to be invoked unless, applying the *Cabazon* test, it is determined that the state, "as a matter of criminal law and public policy, prohibit[s] [class III] gaming activity." § 2701(5). Absent such a conflict, the interests of the tribe and state are to be reconciled through the negotiation of a compact, and, if negotiations fail to achieve a compact and it is determined that the state did not negotiate in good faith, through the litigation and mediation process prescribed by section 2710(d)(7)(A) and (B).

Under the State's approach, on the contrary, even where a state does not prohibit class III gaming as a matter of criminal law and public policy, an Indian tribe could nonetheless conduct such gaming only in accordance with, and by acceptance of, the entire state corpus of laws and regulations

---

**6.** We agree with the district court that, contrary to the State's contention, no significance should be accorded to the modest difference between the introductory language of section 2710(b)(1) ("An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if....") and section 2710(d)(1) ("Class III gaming activities shall be lawful on Indian lands only if....").

governing such gaming.[7] The compact process that Congress established as the centerpiece of the IGRA's regulation of class III gaming would thus become a dead letter; there would be nothing to negotiate, and no meaningful compact would be possible. Congress intended, on the contrary, that:

> Even if a tribe engages in class III gaming pursuant to a compact with the State, it does not necessarily follow that the tribe is subject to the entire body of State law on gaming. The tribe and the State may negotiate terms such as "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity." 25 U.S.C.A. § 2710(d)(3)(C)(i).

*Sisseton–Wahpeton,* 897 F.2d at 366 n. 10.

Finally, in support of its contention that class III gaming should be subjected to the full corpus of state laws and regulations with regard to gambling, the State points to a provision of the IGRA, 18 U.S.C. § 1166(a) (1988), which provides that "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." That provision expressly excludes from the definition of "gambling" subject to its coverage, however, "(1) class I gaming or class II gaming regulated by the [IGRA], or (2) class III gaming conducted under a Tribal–State compact approved by the Secretary of the Interior under [section 2710(d)(8)] that is in effect." § 1166(c).

We accordingly conclude that the district court was correct in applying the *Cabazon* criminal/prohibatory-civil/regulatory test to class III gaming, and next consider whether the district court correctly concluded that Connecticut law regarding such gaming was regulatory rather than prohibitory. We also agree with this ruling.

In *Cabazon,* the Supreme Court found a California statute that allowed some forms of bingo, but not high stakes bingo, to be regulatory in nature, stating: "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular." 480 U.S. at 211, 107 S.Ct. at 1089. In *Sisseton–Wahpeton,* the Eighth Circuit reached a similar conclusion with respect to the permissibility of blackjack as a grandfathered class II activity, reasoning that "many of the forms of gambling permitted by California are also permitted by South Dakota law, e.g., a State lottery, parimutuel horse race betting, and bingo. Consistent with *Cabazon,* we conclude that South Dakota regulates, rather than prohibits, gambling in general and blackjack in particular." 897 F.2d at 368.

So here, the district court concluded, after a careful review of pertinent Connecticut law regarding "Las Vegas nights," that Connecticut "permits games of chance, albeit in a highly regulated form. Thus, such gaming is not totally repugnant to the State's public policy. Connecticut permits other forms of gambling, such as a state-operated lottery, bingo, jai alai and other forms of pari-mutuel betting."

We recognize that *United States v. Dakota,* 666 F.Supp. 989, 997–1000 (W.D.Mich. 1985), *aff'd on other grounds,* 796 F.2d 186 (6th Cir.1986), and *United States v. Burns,* 725 F.Supp. 116, 126 (N.D.N.Y.1989), *appeal pending sub. nom. United States v. Cook,* (2d Cir. Nos. 90–1070, –1072, –1168, and –1179, can be cited for the proposition that a state which allows charities to engage in episodic, regulated casino-type gambling may still be deemed to be in a

---

7. The State's brief and oral argument on appeal make it clear that this is the State's position, as did the letter from Acting Attorney General Riddle to the Tribe's counsel dated July 19, 1989 (Tribe could conduct class III gaming on Reservation only "subject ... to those restrictions contained in the Connecticut General Statutes (§ 7–186a, et seq.) and the regulations of the Division of Special Revenue which are generally applicable to those groups authorized to conduct such a form of entertainment").

prohibitive, rather than regulatory, posture as to *commercial* casino gambling of the type that the Tribe seeks to operate. Neither of these cases, however, interpreted the IGRA, the pertinent provision of which requires an inquiry whether the affected state "permits such gaming for *any* purpose by *any* person, organization, or entity." § 2710(d)(1)(B) (emphasis added). Construing this provision in light of *Cabazon* and *Sisseton–Wahpeton,* we conclude, in agreement with the district court, that the Connecticut law applicable to class III gaming is regulatory rather than prohibitive.

This ruling means only that the State must negotiate with the Tribe concerning the conduct of casino-type games of chance at the Reservation. We necessarily leave to those negotiations the determination whether and to what extent the regulatory framework under which such games of chance are currently permitted in the State shall apply on the Reservation.

## C. The Negotiation Mandate.

■ Finally, the State contends that under the admittedly mandatory provision of section 2710(d)(7)(B)(iii), the district court is required to order the State and the Tribe to conclude a tribal-state compact within sixty days only if it finds that "the State has failed to negotiate in good faith with the Indian tribe," *id.*, with respect to such a compact. Maintaining that the court below "nowhere found that the State had failed to negotiate in good faith," the State argues that the district court's order directing the conclusion of a compact within sixty days must be reversed.

The district court made no express finding as to the State's lack of good faith, probably because the State did not raise the issue below. As the district court noted in its Ruling on Motion for Stay of Judgment, the State "did not specifically object to the sixty-day requirement or assert that it was not applicable in this instance." Thus, the issue was not preserved for appeal. *See Radix Org., Inc. v. Mack Trucks, Inc.,* 602 F.2d 45, 48 (2d Cir.1979). In any event, the State's contention fails on the merits.

First, despite the absence of an explicit finding as to the State's good faith, the district court substantially addressed that issue. The court (1) noted at the outset of its Ruling on Cross–Motions for Summary Judgment that "[the Tribe] asserts that the State has not appointed [a negotiating] team nor commenced negotiations and that over six months has [sic] elapsed since [the Tribe's] request [to negotiate];" (2) addressed in that opinion the central issue whether the State was obligated to negotiate in good faith; and (3) entered a judgment directing the State to "enter into good faith negotiations with the Tribe."

Furthermore, the jurisdictional provision of the IGRA vests jurisdiction in district courts over "any cause of action ... arising from the failure of a State to enter into negotiations ... *or* to conduct such negotiations ... in good faith." §2710(d)(7)(A)(i) (emphasis added). In addition, section 2710(d)(7)(B)(ii) provides that:

[U]pon the introduction of evidence by an Indian tribe that—

(I) a Tribal–State compact had not been entered into ..., and

(II) the State did not respond to the request of the Indian tribe to negotiate such a compact *or* did not respond to such request in good faith,

the burden of proof shall be upon the State to prove that the State *has negotiated with the Indian tribe in good faith* to conclude a Tribal–State compact governing the conduct of gaming activities. 25 U.S.C. § 2710(d)(7)(B)(ii) (1988) (emphasis added).

When a state wholly fails to negotiate, as did Connecticut in the instant case, it obviously cannot meet its burden of proof to show that it negotiated in good faith. *See NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) ("there is no occasion to consider the issue of good faith if a party has refused even to negotiate").

The State's protestations that its failure to negotiate resulted from sincerely held views as to the meaning of the IGRA, and

that it declared its willingness to resolve these legal issues of first impression by litigation, do not alter the outcome. The statutory terms are clear, and provide no exception for sincere but erroneous legal analyses. Further, the manifest purpose of the statute is to move negotiations toward a resolution where a state either fails to negotiate, or fails to negotiate in good faith, for 180 days after a tribal request to negotiate. The delay is hardly ameliorated because the state's refusal to negotiate is not malicious.

## Conclusion

The judgment of the district court is affirmed.