

# Office of the Attorney General
## State of Texas

August 6, 1991

**DAN MORALES**
ATTORNEY GENERAL

Honorable James F. Hury
Chairman
Committee on Ways and Means
Texas House of Representatives
P. O. Box 2910
Austin, Texas 78768-2910

Opinion No. DM-32

Re: Whether the enactment of a bill that would permit gambling within Texas waters would have the effect of permitting gambling on Indian lands (RQ-128)

Dear Representative Hury:

You ask whether the enactment of a bill that would permit gambling on Texas waters would have the effect of permitting gambling on Indian lands located within the state. Specifically, you ask:

> 1. If the legislature enacts a bill that would permit gambling within Texas waters that would be regulated by the state, would such gambling activity also be permitted on Indian lands in Texas?

> 2. If the legislature enacts a bill that would confer authority not on the state, but rather on either counties, cities or special districts to regulate such gambling activity, would such gambling activity also be permitted on Indian lands in Texas?

> 3. If the answer to the first two questions is 'Yes,' would an Indian tribe or members of an Indian tribe that purchase real property that does not comprise part of Indian lands be permitted to conduct a gambling enterprise on that property?

We conclude that, under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, if the Texas legislature enacts a bill that would permit Class III gaming within Texas waters, such gaming activity could also be conducted on Indian lands located within the state, provided that there is compliance with the requirements of section 2710 of title 25 of the United States Code. If the Texas legislature enacted a bill that would delegate regulatory authority to units of local governments within the state, the statute would still satisfy the requirements of the federal statute and thereby permit such gaming activities to be conducted on Indian

lands within the state. If there is compliance with the requirements of section 2719 of title 25 of the United States Code, then such gaming activities could also be conducted on lands acquired by Indian tribes after the effective date of the act. We turn to your first question.

You first ask:

> If the legislature enacts a bill that would permit gambling within Texas waters[1] that would be regulated by the state, would such gambling activity also be permitted on Indian lands in Texas?

In 1987 the United States Supreme Court handed down *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that Indian tribes, in states that otherwise allow gaming, have a right to conduct gaming activities on Indian lands, unimpeded by state regulation. The court's decision followed a long line of cases that began with the case of *Seminole v. Butterworth*, 658 F.2d 310 (5th Cir. 1981), *cert. denied*, 455 U.S. 1020 (1982). In that case, the United States Supreme Court held that Florida[2] could not apply the state's civil regulatory laws governing bingo to the Seminole Tribe's bingo operations. *See also Mashantucket Pequot Tribe v. McGuigan*, 626 F. Supp. 245 (D. Conn. 1986); *Barona Group of Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir. 1982), *cert. denied*, 461 U.S. 929 (1983); *Oneida Tribe of Indians v. Wisconsin*, 518 F. Supp. 712 (W.D. Wis. 1981).

In response to concerns raised by various states to the *Cabazon* case, Congress enacted in 1988 the Indian Gaming Regulatory Act. *See* S. Rep. No. 446 (Indian Affairs Committee), 100th Cong., 2nd Sess. *reprinted in* 1988 U.S. CODE

---

[1] Section 11.012 of the Natural Resources Code provides that the gulfward boundary of the State of Texas is the boundary determined by the United States Supreme Court in *Texas v. Louisiana*, 426 U.S. 465 at n.1 (1976), *citing United States v. Louisiana*, 363 U.S. 1 (1960). The court determined that the boundary of Texas lay three marine leagues (aproximately 10 miles) from its coastline.

[2] Florida is a so-called Public Law 280 state. Public Law 83-280, which is codified in title 18, section 1162, of the United States Code and title 28, section 1360, of the United States Code, authorized the transfer of criminal jurisdiction over Indians and Indian lands from the federal government to those state governments that choose to assert such jurisdiction. Tribes were free to continue to exercise civil jurisdiction over their members and their lands. The law was amended in 1968 to require tribal consent before jurisdiction could be transferred to a state. Since the 1968 amendment, no tribes have granted consent and no additional states are permitted to fall within the statute. *See* S. Rep. No. 100-446.

CONG. & ADMIN. NEWS 3071 (accompanying bill S. 555, which became Indian Regulatory Act). The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, permits Indian tribes to conduct gaming activities under certain circumstances and creates the National Indian Gaming Commission whose responsibility it is to regulate such activity. The act provides that Indian tribes[3] have the exclusive right to regulate gaming activity on Indian lands[4] if the gaming activity is not specifically prohibited by federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity. 25 U.S.C. § 2701(5).

The act establishes three classes of gaming that are subject to differing degrees of federal, state, and tribal regulation. Class I gaming is limited to social games, either ceremonial or for nominal prizes, 25 U.S.C. § 2703(6), and is free of all outside regulation. *Id.* § 2710(a)(1). Class II gaming includes bingo and related games, i.e., games played against other players as opposed to the house. *Id.* § 2703(7). These games are free of state regulation but are subject to some federal oversight by the National Indian Gaming Commission. *Id.* § 2710(b), (c). All other forms of gaming are classified as Class III gaming. *Id.* § 2703(8). Section 2710 provides at subsection (d)(1) that:

---

[3] The act defines "Indian tribe" for purposes of the act:

> The term 'Indian tribe' means any Indian tribe, band, nation, or other organized group or community of Indians which --
>
> (A) is recognized as eligible by the Secretary [of the Interior] for the special programs and services provided by the United States to Indians because of their status as Indians, and
>
> (B) is recognized as possessing powers of self-government.

25 U.S.C. § 2703(5).

[4] The act defines the phrase "Indian lands" in the following fashion:

> The term 'Indian lands' means --
>
> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

Class III gaming activities shall be lawful on Indian lands only if such activities are --

(A) authorized by an ordinance or resolution that --

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b) of this section, and

(iii) is approved by the Chairman [of the National Indian Gaming Commission],

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

Thus, if a bill were enacted that would permit Class III gaming in Texas waters, by the clear terms of the federal statute those sorts of gaming activities that are permitted by the bill to be conducted within state waters could also be conducted by Indian tribes on their lands, provided that a tribal-state compact is effected.[5] Or, to put it simply, if casino gambling is permitted anywhere in Texas, then casino gambling would also be permitted on Indian lands in Texas, so long as the requirements of section 2710 are met.

It is important to note that state law does not determine the type of Class III gaming that may be conducted on Indian land. *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2nd Cir. 1990). Rather, state law must permit some type of Class III gaming before an Indian tribe and a state may enter into a compact

---

[5]A state must negotiate in good faith to enter into such a compact. 25 U.S.C. § 2710(d)(3)(A). In a lawsuit regarding such a compact, the state has the burden of showing that it negotiated in good faith. *Id.* § 2710(d)(7)(B)(ii). In certain circumstances, a court may appoint a mediator to select a compact. *Id.* § 2710(d)(7)(B)(iv); *see Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2nd Cir. 1990).

permitting Class III gaming activities on Indian lands. It is the compact, though, not state law, that determines the type of Class III gaming permitted on Indian lands.

The Indian Gaming Regulatory Act provides that in order for Class III gaming to be permitted on Indian lands, those Indian lands must be "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). It is suggested that a state law that limits the operation of Class III gaming in Texas to a specific geographical area would not be a law that "permits such gaming for any purpose by any person, organization, or entity" sufficient to satisfy the requirements of the Indian Gaming Regulatory Act. It is suggested that the Indian Gaming Regulatory Act should be construed to require that Indians be subjected to the same limitations on location, size of the pot, and size of the wager that are imposed by state law on that state's citizens.

In *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2nd Cir. 1990) (hereinafter *Mashantucket*), a federal appeals court rejected a similar argument in a case involving a Connecticut statute that did not generally permit gaming but that authorized nonprofit organizations to conduct "Las Vegas nights."[6] An Indian tribe located in Connecticut sought a federal court order requiring the state of Connecticut to negotiate with the tribe for the purpose of concluding a tribal-state compact, that would permit the tribe to conduct casino-type gaming. Before the federal district court, the state argued, *inter alia*, that the sort of gaming activity that state law permitted nonprofit organizations to conduct in Connecticut was not comparable to casino-type gaming, and therefore, casino-type gaming was not a permissible Class III gaming activity for purposes of the federal act:

> The State argues that the use of the phrase 'such gaming' as opposed to 'such type of gaming' evidences the intent of Congress that, with regard to Class III gaming, only the actual forms of gambling which the State has legalized need to be the subject of compact negotiations. . . . The State argues that if the restrictions it has imposed on Las Vegas nights are removed, such gaming becomes professional gambling which is prohibited in Connecticut as a matter of criminal law and public policy.

---

[6] "The games of chance that Connecticut permits at the 'Las Vegas nights' include blackjack, poker, dice, money-wheels, roulette, baccarat, chuck-a-luck, pan game, over and under, horse race games, acey-ducey, beat the dealer, and bouncing ball." *Mashantucket* at n.5, *citing*, Conn. Gen. Stat. §§ 7-186a to 7-186p (1989).

*Mashantucket Pequot Tribe v. Connecticut*, 737 F. Supp. 169, 173 (D. Conn. 1990). The state made the identical argument before the federal appellate court. *Mashantucket*, 913 F.2d at 1029.

As noted earlier, federal law made Indian tribes subject to a state's criminal laws, but not a state's civil laws. In rejecting Connecticut's argument, the federal appeals court noted that the United States Supreme Court in *Cabazon* set forth a civil/regulatory and criminal/prohibitory test prior to the enactment of the federal statute to determine whether Indians were subject to the state's authority:

> [I]f the intent of a state law is generally to prohibit certain conduct, it falls within [the area] of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory.... The shorthand test is whether the conduct as issue violates the State's public policy.

*Id., citing California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 209 (1987) (brackets in original). The court then relied on legislative history indicating that the intent of Congress in enacting the language governing Class II gaming was to preserve the *Cabazon* test:

> [T]he Committee anticipates that Federal courts will rely on the distinction between State criminal laws which prohibit certain activities and the civil laws of a State which impose a regulatory scheme upon those activities to determine whether Class II games are allowed in certain States. This distinction has been discussed by the Federal courts many times, most recently and notably by the Supreme Court in %iCabazon [sic].

*Id., citing* S. Rep. at 6, 1988 U.S. CODE CONG. & ADMIN. NEWS 3076 (brackets in original); *see also United States v. Sisseton-Wahpeton Sioux Tribe*, 897 F.2d 358, 365 (8th Cir. 1990) (construing title 25 of the United States Code section 2710(b)(1)(A) and Class II gaming: "[T]he legislative history reveals that Congress intended to permit a particular gaming activity, even if conducted in a manner inconsistent with state law, if the state law merely regulated, as opposed to completely barred, that particular gaming activity.").

Noting that the language in the federal statute governing Class III gaming is identical to that governing Class II gaming, the *Mashantucket* court concluded that

Connecticut regulated, rather than barred, the gaming activity at issue and rejected the state's construction of the federal statute.  Based upon the federal appellate courts' construction of subsections (d)(1)(A) and (d)(1)(B) of section 2710, we think that the courts probably would hold that Texas regulates Class III gaming activity, rather than bars it.  Thus, if a bill were enacted by the Texas legislature permitting Class III gaming activities anywhere within the state, such gaming activities could be conducted on Indian lands in Texas, provided that a tribal-state compact is effected.

It has also been suggested that the federal bills that re-establish federal control over the three Indian lands in Texas would act to prevent any of the tribes from conducting Class III gaming activities on their lands.  Congress restored a trust relationship between the United States and two of the tribes, the Alabama and Coushatta Indian Tribes of Texas and the Ysleta Del Sur Pueblo Indians, by statute after the issuance of Attorney General Opinion JM-17 (1983)[7] and holds certain lands in trust for their benefit.  *See* 25 U.S.C. subch. XXXI-A, §§ 731 - 737, 25 U.S.C. subch. LXXVIII, §§ 1300g - 1300g-7.  Thus, those lands fall within the ambit of the definition of "Indian lands" set forth in section 2703(4).  Both tribes are proscribed by the federal act restoring a federal trust relationship from engaging in any gaming activity that is prohibited by the laws of the state of Texas.  *See* 25 U.S.C. §§ 737 (governing the Alabama and Coushatta Indian Tribes of Texas), 1300g-6 (governing the Ysleta Del Sur Pueblo Indians).[8]

The Indian Regulatory Gaming Act was enacted in 1988 after the 1983 enactment of the bill restoring the federal trust relationship with two of the three Indian tribes in Texas.  The Indian Gaming Regulatory Act does not explicitly repeal those provisions of the federal act restoring a federal trust relationship that proscribe the tribes' engaging in gaming activities that are not permitted by Texas law.  However, the "last-in-time" rule, which provides that a statute enacted after the

---

[7]Attorney General Opinion JM-17 (1983) addressed the authority of the state of Texas to enforce its gaming laws on certain Indian lands within the state.  The opinion, *inter alia*, traced the history of federal and state legislation affecting Indians in Texas and noted that with the termination in 1955 of the trust relationship between the federal government and the Indian tribes, the members of the tribe became subject to the laws of the state in the same manner as other citizens.  As a result of the issuance of the opinion, Congress restored the federal trust relationship in 1983.

[8] While the third tribe, the Texas Band of Kickapoo Indians, does not have a trust relationship with the United States government, *see* 25 U.S.C. §§ 1300b-11 - 1300b-16, the tribe reportedly has entered into an agreement that provides, *inter alia*, that Texas laws regarding gaming will be followed by the tribe.  The Department of Interior, pursuant to general authority conferred by section 465 of title 25 of the United States Code, accepted land in trust for the benefit of the Texas Band of Kickapoo Indians.  *See generally* Attorney General Opinion JM-1040 (1989).

passage of an earlier statute controls in the event of conflict, applies to statutes governing Indian tribes. *See, e.g., Yankton Sioux Tribe v. United States*, 623 F.2d 159 (Ct. Cl. 1980); *see also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977). This rule would support a construction that Congress intended the Indian Gaming Regulatory Act to apply to all Indian tribes that would otherwise fall within the ambit of the act.[9]   In light of that rule, we think that a court would conclude that the Indian Gaming Regulatory Act controls.

Your second question asks:

> If the legislature enacts a bill that would confer authority not on the state, but rather on either counties, cities or special districts to regulate such gambling activity, would such gambling activity also be permitted on Indian lands in Texas?

We answer your second question in the affirmative. Subsection (d)(1)(B) of section 2710 permits gaming on Indian lands only if such activities are, *inter alia*, "located in a State that permits such gaming for any purpose by any person, organization, or entity." A statute that confers regulatory authority to units of local government would satisfy this requirement.

Your third question is:

> If the answer to the first two questions is 'Yes,' would an Indian tribe or members of an Indian tribe that purchases real property that does not comprise part of Indian land be permitted to conduct a gambling enterprise on that property?

We note at the outset that section 2710 permits Indian *tribes*, as defined in the act, to conduct certain gaming activities; it does not authorize individual Indians to do so. Therefore, with respect to individual members of tribes, we answer your third question in the negative. With respect to Indian tribes, however, we answer your question with a qualified "Yes." The act does not permit gaming on lands

---

[9] The rule has been applied to treaties with Indian tribes. *The Cherokee Tobacco*, 78 U.S. 616 (1870). However, at issue here are federal statutes. *See* Newton, *Federal Power over Indians: Its Sources, Scope, and Limitations*, 132 U. Pa. L. Rev. 195 (1984). *See generally* Comment, *Statutory Construction -- Wildlife Protection Versus Indian Treaty Hunting Rights*, 57 Wash. L. Rev. 225 (1981); Wilkinson & Volkman, *Judicial Review of Indian Treaty Abrogation: "As Long as Water Flows, or Grass Grows Upon the Earth" -- How Long a Time is That?*, 63 Calif. L. Rev. 601 (1975).

purchased by Indian tribes, rather it permits gaming to be conducted on Indian lands acquired in a certain manner and before a certain date.

Section 2719(a) of the act generally prohibits gaming on lands acquired by the federal government in trust for the benefit of Indians[10] after the effective date of the act, October 17, 1988:

> (a) Prohibition on lands acquired in trust by Secretary
>
> Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless --
>
> (1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988, and --
>
> (2) the Indian tribe has no reservation on October 17, 1988, or --
>
> . . . .
>
> (B) such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

Section 2719(b) of the act, however, provides certain exceptions to this general prohibition and provides in pertinent part:

> (b) Exceptions
>
> (1) Subsection (a) of this section will not apply when --
>
> (A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming

---

[10] *See generally* 25 U.S.C. § 465 (general authorization for the Department of Interior to acquire land to hold in trust for Indians).

establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

(B) lands are taken into trust as part of --

(i) a settlement of a land claim,

(ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

Thus, if the provisions of section 2719(b) are complied with, an Indian tribe would be able to conduct gaming activities on land acquired in trust subsequent to the date of the enactment of the statute.

## SUMMARY

Under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 *et seq.*, if the legislature enacts a bill that would permit Class III gaming within Texas waters, such gaming activity could also be conducted on Indian lands located within the state. If the legislature enacted a bill that would delegate regulatory authority to units of local government, the statute would still satisfy the requirements of the federal statute and thereby permit such gaming activities to be conducted on Indian lands. If the requirements of section 2719 of title 25 of the United States Code are complied with, then such gaming activities could be conducted on land acquired by Indian tribes after the effective date of the act.

Very truly yours,

DAN MORALES
Attorney General of Texas

WILL PRYOR
First Assistant Attorney General

MARY KELLER
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY (Ret.)
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

MADELEINE B. JOHNSON
Chair, Opinion Committee

Prepared by Jim Moellinger
Assistant Attorney General