LAC du FLAMBEAU BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; and the Sokaogon Chippewa Community, Plaintiffs,

v.

STATE OF WISCONSIN; Tommy G. Thompson, Governor of the State of Wisconsin; Donald J. Hanaway, Attorney General of the State of Wisconsin; David Vernon Penn, District Attorney of Vilas County, Wisconsin; and Janet L. Marvin, District Attorney of Forest County, Wisconsin, Defendants.

No. 90–C–408–C.

United States District Court, W.D. Wisconsin.

June 18, 1991.

Bruce R. Greene, Boulder, Colo., for Lac du Flambeau Band.

Milton Rosenberg, Madison, Wis., for Sokaogon Chippewa Community.

Waltraud A. Arts, Asst. Atty. Gen., Madison, Wis., for State of Wis., Tommy G. Thompson, Donald J. Hanaway, David Vernon Penn, Janet L. Marvin.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action brought under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, arising out of defendants' alleged failure to bargain in good faith with plaintiffs on the terms of a tribal-state Indian gaming compact. Defendants concede that the state has refused to bargain over certain gaming activities that it believes are not proper subjects of negotiation. They represent, however, that the state is prepared to return to negotiations once the court has determined whether the disputed activities are proper subjects for a compact.

The case is before the court on defendants' motion for summary judgment, and their motions to strike the affidavits of Rita Keshena, Milton Rosenberg and James Landru. Jurisdiction is present. 25 U.S.C. § 2710(d)(7)(A).

The Indian Gaming Regulatory Act is the product of years of legislative effort to devise a comprehensive scheme for regulating gaming activities on Indian lands. It reflects congressional concerns about the increasing reliance of Indian tribes on gaming revenues for the provision of governmental services to tribal communities and the lack of mechanisms for regulating gaming activity. The essential feature of the Act is the tribal-state compact process, the means Congress devised to balance the states' interest in regulating high stakes gambling within their borders and the Indians' resistance to state intrusions on their sovereignty. The structure of the Act conforms to the basic principle that the states and tribes negotiate as sovereigns. *See* S.Rep. No. 100–446, 100th Cong., 2d Sess. at 13:

> After lengthy hearings, negotiations and discussions, the Committee concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign

entities are met with respect to the regulation of complex gaming enterprises such as pari-mutuel horse and dog racing, casino gaming, jai alai and so forth. The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for setting [sic] various matters between two equal sovereigns.

The Act divides gaming activities into three classes. Class I includes social games played solely for prizes of minimal value and traditional forms of Indian gaming engaged in as part of a tribal celebration or ceremony. 25 U.S.C. § 2703(6). These activities are within the exclusive jurisdiction of the tribe. § 2710(a)(1). Class II games include bingo and related games and non-banking card games, as well as certain "grandfathered" card games that were operated by Indian tribes in four named states before May 1, 1988. Section 2703(7). Specifically excepted from Class II are non-grandfathered banking games such as baccarat, chemin de fer or blackjack, and video games of chance and slot machines. Class II gaming is within the jurisdiction of the tribes, subject to the requirements of the Act, with some oversight by the National Indian Gaming Commission. Section 2710(a)(2).

Class III includes all other forms of gaming. 25 U.S.C. § 2703(8). Class III gaming activities are lawful on Indian lands only if the activities are (1) authorized by an ordinance or resolution adopted by the governing body of the tribe that meets the requirements of the statute and is approved by the commission chairman; (2) located in a state that permits such gaming

for any purpose by any person, organization or entity; and (3) conducted in conformance with a tribal-state compact entered into by the tribe and the state. Section 2710(d).

The parties dispute whether the state is required to include casino games, video games and slot machines in its negotiations with the tribes.[1] I conclude that it is required to negotiate those activities because they are permitted under Wisconsin law within the meaning of 25 U.S.C. § 2710(d)(1)(B). Accordingly, I will deny defendants' motion for summary judgment.

For the purpose only of deciding defendants' motion for summary judgment, I find that there is no genuine issue with respect to any of the following material facts set forth under the heading "Facts." In making these findings, I have not taken into consideration any of the averments included in the affidavits of Rita Keshena, Milton Rosenberg or James Landru, because those averments relate to the manner in which the state has negotiated with the tribes or to the state negotiators' understanding of the scope of the negotiations for a tribal-state compact and have no bearing on the issue raised on the motion for partial summary judgment, which is whether the gaming activities at issue are lawful under 25 U.S.C. § 2710(d). It is irrelevant whether the state bargained in good faith because it concedes it has not bargained on the disputed activities and is prepared to conclude a compact once it has been determined which activities must be included in the negotiations. It is irrelevant also what the negotiators thought the statute requires; the requirements of the statute raise an issue of law and not of fact.

## FACTS

Plaintiffs Lac du Flambeau Tribe of Lake Superior Chippewa Indians and Sokaogon Chippewa Community are federally-acknowledged Indian tribes with reserva-

---

1. In this opinion, the term "casino game" refers to banking card games played against the house, such as baccarat, chemin de fer and blackjack, and to roulette, poker and craps. The term

"video games" is used as shorthand for electronic or electromechanical facsimiles of any game of chance. *See* 25 U.S.C. § 2703(7)(B)(ii).

tions in the State of Wisconsin. Defendant State of Wisconsin is a sovereign state of the United States. Defendant Tommy G. Thompson is Governor of the State of Wisconsin. Defendant David Penn is the District Attorney for Vilas County, Wisconsin. At all times relevant to this suit, defendant Donald J. Hanaway was the Attorney General of the State of Wisconsin, and defendant Janet Marvin was the District Attorney for Forest County, Wisconsin.

The Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.*, became effective October 17, 1988. On November 16, 1988, plaintiff Lac du Flambeau submitted a written request for tribal-state compact negotiations. Although plaintiff Sokaogon never submitted a written request, it was a party to the various efforts at negotiation that were carried out with the plaintiff tribes as well as with other Wisconsin tribes.

On July 19, 1989, plaintiff Lac du Flambeau proposed as class III gaming activities the following games: "Black Jack 21—cards, Cards, Video/Slots, games such as Black–Jack and Poker, Craps, Roulette, Keno, off track betting parlor, Sports book." On October 18, 1989, the Department of Justice's tribal-state gaming compact negotiator sent plaintiff Lac du Flambeau a final draft of the tribal-state gaming compact between it and the State of Wisconsin.

On November 14, 1989, Michael Allen, plaintiff Lac du Flambeau's tribal president, resubmitted a gaming compact to the State of Wisconsin based on tribal council action of November 13, 1989. The resubmitted compact covered casino games, including video gaming machines, roulette, slot machines, poker and craps.

The final draft gaming compact with plaintiff Sokaogon covered casino games, including video gaming machines, blackjack, roulette, slot machines, poker and craps.

When bill drafts of the tribal-state gaming compacts were requested, legislative lawyers raised questions about the scope of the games that had been negotiated, particularly about the inclusion of activities not conducted by anyone else in Wisconsin. On October 24, 1989, the Wisconsin Lottery Board requested an attorney general's opinion on the scope of gaming permitted in Wisconsin. On February 5, 1990, defendant Hanaway issued an opinion to the effect that class III games were prohibited in Wisconsin with the exception of lotteries and on-track parimutuel wagering. Since then, the State of Wisconsin has refused to negotiate on any class III activities other than lotteries and on-track betting.

At the present time, the Wisconsin Lottery conducts three types of lotteries in which prizes are distributed among persons who purchase tickets: instant scratch games, pull-tab or break-open games, and on-line games. Instant scratch games are lotteries that use preprinted tickets with a latex covering that is scratched off to reveal the play symbols underneath. A player wins when a winning combination of play symbols is printed on the ticket. The lottery also offers additional methods of play such as secondary drawings for persons who hold winning instant scratch tickets.

Pull-tab or break-open games utilize preprinted tickets made of laminated paper that is partially perforated to allow a strip to be torn to reveal the symbols underneath. As in instant scratch games, the player wins if there is a winning combination of symbols on the ticket.

In on-line games, the player chooses (or the computer selects) a subset of six numbers from a larger set of numbers. The winning numbers are determined by a drawing, and prizes are paid for matching, in any order, six, five or four of the numbers drawn. Tickets are issued by a computer terminal connected electronically to a central computer that records and confirms the play. The ticket is the evidence of the player's entry numbers and is the only basis on which a prize may be claimed. Wisconsin's MEGABUCKS, Lotto*America, is an on-line game in which the player chooses (or the computer selects) six different numbers between 1 and 54, and prizes are awarded for matching four, five or six of the numbers drawn. It is offered simul-

taneously by sixteen governmental jurisdictions within the United States through a commonly administered drawing and prize pool. SuperCash is an on-line game with a set top prize of $250,000 for matching correctly, in any order, six, five or four of the numbers drawn. A third type of on-line game adds a secondary method of playing an on-line game. For example, a person may win a small cash prize if he or she happens to be the 99th person to purchase a ticket, as determined by the central computer.

The Wisconsin Racing Board is an agency of the State of Wisconsin. It regulates racing and on-track parimutuel wagering in the state, and issues licenses to applicants who wish to own and operate racetracks at which on-track parimutuel wagering is conducted. It has licensed five dog racetracks since it began operating.

## OPINION

Plaintiffs' complaint states two causes of action: a claim pursuant to 28 U.S.C. § 1362 to enjoin defendants Penn and Marvin from prosecuting the plaintiffs for operating certain gaming activities on their reservations, and the claim at issue, that the state failed to bargain with plaintiffs in good faith within the meaning of the Indian Gaming Regulatory Act. Plaintiffs' motion for a preliminary injunction on the first claim was denied in an opinion entered July 18, 1990. I held then that the class III activities the plaintiffs were offering on their reservations were illegal under federal law in the absence of a federal-state compact; that the state has no jurisdiction to prosecute violations of its gaming laws on the reservations; that such prosecutions are within the exclusive jurisdiction of the federal government; and that plaintiffs could show no irreparable harm from the threat of unlawful state prosecution be-

cause they could avert such harm simply by ceasing their illegal gaming activity. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin,* 743 F.Supp. 645 (W.D.Wis.1990). None of those holdings is implicated in the present motion, which relates only to the interpretation of § 2710(d)(1) of the Indian Gaming Regulatory Act.

Defendants concede that the state's refusal to bargain casino games, video games and slot machines subjects it to an order from the court requiring it to reach a compact with the plaintiffs within sixty days. Defendants have stipulated with plaintiff Lac du Flambeau that once their motion for summary judgment is decided, an order can issue giving the state sixty days in which to reach a compact with the Lac du Flambeau. This concession and stipulation make it unnecessary to hold a trial or evidentiary hearing to determine whether the state has negotiated in good faith with plaintiff Lac du Flambeau, and leave the only question before the court the proper interpretation of the Indian Gaming Regulatory Act.[2]

The issue between the parties centers on the provision in 25 U.S.C. § 2710(d)(1) that "Class III gaming activities shall be lawful on Indian lands only if such activities are.... (B) located in a State that *permits such gaming* for any purpose by any person, organization, or entity...." (Emphasis added.) Defendants argue that casino games, video games and slot machines are not permitted for any purpose by any person, organization or entity within Wisconsin; because they are not, the state is not required to bargain over these games. Defendants' position is that Congress meant "permits" to be given its usual dictionary meaning of formally or expressly granting leave; therefore, unless a state grants

2. Plaintiff Sokaogon has refused to enter into a similar stipulation, wishing to preserve its right to demonstrate the state's lack of good faith in negotiation. Given the state's concession that it has failed to negotiate over any Class III activities, including those that are clearly subject to negotiation because they are in operation in Wisconsin, it is difficult to understand what advantage plaintiff Sokaogon thinks it is gaining

by refusing to stipulate. It can gain no remedy other than the one the state has conceded even if it shows that the state has demonstrated other indicia of bad faith in its negotiations. Plaintiff suggests that findings of bad faith by the court would have a material effect on the mediator's choice of last, best offer should the negotiations reach an impasse, but this suggestion is without foundation.

leave expressly for the playing of a particular type of gaming activity within the state, that activity cannot be lawful on Indian lands. Under this approach, the state is required to bargain only over gaming activities that are operating legally within the state.

Defendants' reading of "permits" ignores the other meanings assigned to the word, such as "[t]o suffer, allow, consent, let; to give leave or license; to acquiesce by failure to prevent, or to expressly assent or agree to the doing of an act." Black's Law Dictionary (5th ed.). More important, it ignores the Supreme Court's opinion in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), on which Congress relied in drafting the Indian Regulatory Gaming Act. In *Cabazon*, the Supreme Court held that in determining whether a state's criminal laws would apply to gambling on Indian lands under Public Law 83–280, a court must analyze the state's policy toward gambling.[3] If the policy is to prohibit all forms of gambling by anyone, then the policy is characterized as criminal-prohibitory and the state's criminal laws apply to tribal gaming activity. On the other hand, if the state allows some forms of gambling, even subject to extensive regulation, its policy is deemed to be civil-regulatory and it is barred from enforcing its gambling laws on the reservation. California's policy was found to be regulatory: the state permitted and even promoted many forms of gambling, including a state-run lottery, parimutuel racing, bingo, and the card games played in the tribal card room. Because California regulated rather than prohibited gambling in general and bingo in particular, *id.* at 211, 107 S.Ct. at 1089, it could not enforce its criminal gambling laws against the Cabazon band's high-stakes bingo and card games without infringing impermissibly on tribal sovereignty. *Id.* at 222, 107 S.Ct. at 1095.

The Senate Report on the Indian Gaming Regulatory Act makes explicit reference to *Cabazon* in discussing class II gaming, which has the same requirement as class III gaming that the gaming activity be "located within a state that permits such gaming for any purpose by any person, organization or entity." Section 2710(b)(1)(A). The Senate committee stated that it anticipated that the federal courts would rely on the *Cabazon* distinction between regulatory gaming schemes and prohibitory laws, explaining with regard to the scope of allowable activities:

> The Committee wishes to make clear that, under S.555 [the gaming act], application of the prohibitory/regulatory distinction is markedly different from the application of the distinction in the context of Public Law 83–280. Here, the courts will consider the distinction between a State's civil and criminal laws to determine whether a body of law is applicable, as a matter of Federal law, to either allow or prohibit certain activities.

S.Rep. No. 100–446, at 6. Under Pub.L. 280, a court looks at the civil-criminal distinction to determine whether a state can go onto an Indian reservation to enforce the state's criminal gambling laws; under the Indian Gaming Regulatory Act, the court looks at the distinction between the state's civil and criminal laws to determine whether the state permits gaming activities of the type at issue.

Although the Senate committee was speaking of class II activities, its comments are equally applicable to the requirement for class III activities. 25 U.S.C. § 2710(d)(1)(B). *See Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1030, (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1620, 113 L.Ed.2d 717 (1991): "We deem this legislative history [relating to class II gaming] instructive with respect to the meaning of the identical language in

---

**3.** Pub.L. No. 83–280, which was enacted in 1953 and codified as 18 U.S.C. § 1162 and 28 U.S.C. § 1360, gave six states, including Wisconsin, limited civil and general criminal jurisdiction in certain areas of Indian country within their borders. As a result, Wisconsin has criminal jurisdiction over offenses committed by or against Indians in all Indian country within the state, with the exception of the Menominee Reservation, "to the same extent that [it] has jurisdiction over offenses committed elsewhere within the State...." 18 U.S.C. § 1162(a).

section 2710(d)(1)(B), regarding class III gaming, which we must interpret." *See also United States v. Nunez,* 573 F.2d 769, 771 (2d Cir.), *cert. denied,* 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978) (settled principle of statutory construction that same word or phrase used in more than one section of statute will be construed to have same meaning in next place if its meaning in the first place is clear).

█ In addition, the congressional findings set out at subsection (5) of 25 U.S.C. § 2701 support the view that Congress did not intend the term "permits such gaming" to limit the tribes to the specific types of gaming activity actually in operation in a state.

> Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, *prohibit* such gaming activity. [Emphasis added.]

In light of the legislative history and the congressional findings, I conclude that the initial question in determining whether Wisconsin "permits" the gaming activities at issue is not whether the state has given express approval to the playing of a particular game, but whether Wisconsin's public policy toward class III gaming is prohibitory or regulatory.

The original Wisconsin Constitution provided that "[e]xcept as provided in this section, the legislature shall never authorize any lottery, or grant any divorce." For more than a century, this prohibition against "any lottery" was interpreted as prohibiting the operation or playing of any game, scheme or plan involving the elements of prize, chance and consideration. The prohibition against a "lottery" has been held to outlaw theater promotions, *State ex rel. Cowie v. La Crosse Theaters Co.,* 232 Wis. 153, 286 N.W. 707 (1939);

mercantile promotions, *State ex rel. Regez v. Blumer,* 236 Wis. 129, 294 N.W. 491 (1940); charitable bingo, *State ex rel. Trampe v. Multerer,* 234 Wis. 50, 289 N.W. 600 (1940); and television games of chance, *State v. Laven,* 270 Wis. 524, 71 N.W.2d 287 (1955). In 1965, however, the constitution was amended to allow Wisconsin citizens to participate in promotional sweepstakes (by defining "consideration" as not including listening to or watching a radio or television program or visiting a store or other place without being required to make a purchase or pay a fee). The constitution was amended again in 1973 to authorize bingo when played by charitable organizations, and in 1977 to allow raffles for charitable organizations. In 1987 the electorate approved two constitutional amendments: one authorized the state to operate a lottery, with the proceeds going to property tax relief, Wis. Const. Art. 4, § 24(6); the second removed any prohibition on parimutuel on-track betting. Art. 4, § 24(5).

When the voters authorized a state-operated "lottery," they removed any remaining constitutional prohibition against state-operated games, schemes or plans involving prize, chance and consideration, with minor exceptions. *See* Op.Att'y Gen.Wis. 10–91, slip op. at 5 ("Under the [state] constitution, the Legislature may authorize any type of state-operated lottery subject only to the advertising, use-of-revenue and off-track wagering restrictions.") [4]

█ The amendments to the Wisconsin Constitution evidence a state policy toward gaming that is now regulatory rather than prohibitory in nature. *See Cabazon,* 480 U.S. at 211, 107 S.Ct. at 1089: "In light of the fact that California permits a substantial amount of gambling activity, including bingo, and actually promotes gambling through its state lottery, we must conclude that California regulates rather than prohibits gambling in general and bingo in particular." The fact that Wisconsin continues to prohibit commercial gambling and

---

**4.** This conclusion departs from the conclusion of defendant Hanaway, former Attorney General, expressed in Op.Att'y Gen.Wis. 3–90. Defendant Hanaway found that the framers of the state constitution and the members of the legis-

lature considered lotteries a form of gambling separate and distinct from other forms of gambling such as betting, playing gambling machines, etc.

unlicensed gaming activities does not make its policy prohibitory. *See Cabazon,* 480 U.S. at 211, 107 S.Ct. at 1089, rejecting a similar argument by the State of California, which asserted that it could prohibit high stakes, unregulated bingo on the reservation because it treated such bingo as a misdemeanor under state law: "that an otherwise regulatory law is enforceable by criminal as well as civil means does not necessarily convert it into a criminal law within the meaning of Pub.L. 280." *See also Mashantucket Pequot Tribe,* 913 F.2d at 1029 (state's allowance of state-operated lottery, bingo, jai alai and other forms of parimutuel betting evidence a regulatory rather than prohibitory policy toward class III gaming although state outlawed the casino games at issue except for fund-raising purposes by nonprofit organizations under certain highly regulated circumstances); *United States v. Sisseton-Wahpeton Sioux Tribe,* 897 F.2d 358, 367 (8th Cir.1990) (existence of state-regulated blackjack, bingo, parimutuel horse and dog race betting, state lottery, and slot machines shows South Dakota's gaming policy to be non-prohibitory, although state had outlawed card games played for money until institution of this action).

Defendants argue that even if Wisconsin is viewed as having a regulatory policy toward class III gaming activities in general, the state need not negotiate the specific activities in dispute because it does not permit expressly the type of gaming plaintiffs want to offer on their reservations. It is not necessary for plaintiffs to show that the state formally authorizes the same activities plaintiffs wish to offer. The inquiry is whether Wisconsin prohibits those particular gaming activities. It does not.

■ Defendants' assertion that they are required to negotiate only the identical types of games currently offered by the lottery board misconceives the point of the Indian Gaming Regulatory Act, as well as the holding in *Cabazon.* It was not Congress's intent that the states would be able to impose their gaming regulatory schemes on the tribes. The Act's drafters intended to leave it to the sovereign state and tribal governments to negotiate the specific gaming activities involving prize, chance and consideration that each tribe will offer under the terms of its tribal-state compact. *See Mashantucket Pequot Tribe,* 913 F.2d at 1024:

> The compact process is therefore to be invoked unless, applying the *Cabazon* test, it is determined that the state, "as a matter of criminal law and public policy, prohibit[s] [class III] gaming activity." § 2701(5). Absent such a conflict, the interests of the tribe and state are to be reconciled through the negotiation of a compact, and, if negotiations fail to achieve a compact and it is determined that the state did not negotiate in good faith, through the litigation and mediation process prescribed by section 2710(d)(7)(A) and (B).

*Id.* at 1030.

Although defendants insist that their position is not that the tribes are limited to negotiating "the exact games" that the state lottery operates, they argue that Wisconsin law must give express authorization for a "gaming activity" before it can be a proper subject of negotiation. Defendants offer no authority for distinguishing between the state's current lottery games and the activities proposed for negotiation by the tribes. Instead, the state makes the bald statement that casino games "are of a wholly different character than a state lottery or on-track pari-mutual wagering." Defendants' reply brief at 17. The state's current attorney general has rejected the imposition of artificial distinctions within the term lottery, so long as the activity involves the elements of prize, chance and consideration and is not addressed explicitly by the constitutional amendments. Op. Att'y Gen.Wis. 10–91, slip op. at 5–7. I find no reason to impose similarly artificial categories in applying the *Cabazon* test and in interpreting the Indian Gaming Regulatory Act.

Defendants make one final argument in support of their contention that Congress never intended to permit tribes to conduct games not in operation in the state: a large part of the reasoning behind the compacts

was to utilize the regulatory mechanisms for gaming already in place in the states. *See* S.Rep. No. 446 at 13–14. Defendants' argument has some merit, but it founders on the actual language used by Congress, and the source of that language. The term is "permits," not "operates" or "is in operation." Congress has stated that "permits" is to be interpreted under the *Cabazon* analysis. Therefore, the fact that a state *permits* an activity does not mean that the state has a mechanism in place to regulate the precise activities the tribes wish to offer. A state might not prohibit a particular Class III gaming activity, but simply allow it to be conducted, without taking any steps to restrict it in any way. Or a state might allow certain Class III gaming activity to be carried out by small charitable groups on very limited occasions without having any mechanism in place to regulate the same activity carried out on a large scale basis. *See, e.g., Mashantucket Pequot Tribe*, 913 F.2d 1024 (state that permitted "Las Vegas nights" to be operated by nonprofit organizations subject to statutory restrictions was required to negotiate over inclusion in tribal-state compact of banking games such as baccarat, chemin de fer, and blackjack, as well as roulette and poker that were played at such parties).

I conclude that the state is required to negotiate with plaintiffs over the inclusion in a tribal-state compact of any activity that includes the elements of prize, chance and consideration and that is not prohibited expressly by the Wisconsin Constitution or state law.

To ensure that states engage in negotiations with Indian tribes, the Indian Gaming Regulatory Act requires the states to negotiate in good faith with any tribes that request negotiation, and it gives federal courts jurisdiction over cases brought by Indian tribes arising from the failure of a state to enter into negotiations or to conduct such negotiations in good faith. 25 U.S.C. § 2710(d)(3)(A) and (7)(A). If a state fails to negotiate in good faith the court may require it to conclude a compact within sixty days, § 2710(d)(7)(B)(iii), and shall appoint a mediator to conclude a compact if negotiations are not successful.

§ 2710(d)(7)(B)(iv). Pursuant to § 2710(d)(7)(B)(iii) and the state's concession that it has failed to negotiate over activities I have now determined must be the subjects of negotiation, the state will be required to conclude a compact with each plaintiff within sixty days. If plaintiff Sokaogon objects to this order, it shall have seven days in which to make its objections known.

## ORDER

IT IS ORDERED that defendants' motion to strike the affidavits of Rita Keshena, Milton Rosenberg and James Landru is GRANTED and defendants' motion for summary judgment is DENIED. FURTHER, IT IS ORDERED that pursuant to 25 U.S.C. § 2710(d)(7)(B)(ii), the State of Wisconsin is REQUIRED to conclude a tribal-state class III gaming compact with plaintiff Lac du Flambeau Band of Lake Superior Chippewa Indians and with plaintiff Sokaogon Chippewa Community gaming compact within sixty (60) days from the date of this order. If plaintiff Sokaogon Chippewa Community objects to the order requiring the state to conclude a compact with it, it is to make its objections known within seven (7) days of the date of this order.