Dear Governor Walters
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following question:
In light of the legislative history of the Indian GamingRegulatory Act, 25 U.S.C.A. 2701, et seq., and case lawrecognizing the distinction between state laws which arecriminal/prohibitory and laws which are civil/regulatory, ispari-mutuel wagering on horse racing at other than race tracklocations a proper subject of a gaming compact between the Stateof Oklahoma and an Indian tribe?
 I. INTRODUCTION
¶ 1 A determination of whether pari-mutuel wagering on horse racing other than at a race track location is a proper subject of a gaming compact between the State of Oklahoma and a federally recognized Indian tribe requires a review of the provisions and legislative history of the Indian Gaming Regulatory Act (Act or IGRA), federal case law interpreting the Act, any federal law principles employed in the Act, and the gaming laws of Oklahoma. We begin with an examination of the Indian Gaming Regulatory Act.
 II. GENERAL NATURE OF THE INDIAN GAMING REGULATORY ACT
1. Games Regulated by the Tribes, Either Alone or With FederalSupervision
¶ 2 In regulating gaming on Indian land, the Act divides gaming into three classes. Two of the classes are regulated by the Indian tribes, either alone or with Federal supervision. Class I gaming consists of social games solely for prizes of minimal value and traditional forms of Indian gaming.25 U.S.C.A. 2703(6). Jurisdiction over Class I gaming lies exclusively with the Indian tribe, and these games are not subject to the provisions of the Act. 25 U.S.C.A. 2710(a)(1).
¶ 3 Class II gaming consists of bingo and, if played in the same location, pull tabs, lotto, punch boards, tip jars, instant bingos and other games similar to bingo. It also includes certain card games. 25 U.S.C.A. 2703(7)(A). Class II gaming, while left within the jurisdiction of the Indian tribe, requires, among other things, federal approval of all tribal ordinances or resolutions regulating such gaming. 25 U.S.C.A. 2710(a) and (b).
2. Games Regulated Under Tribal-State Compacts, in States Wherethe Type of Gaming Activity is Already Permitted
¶ 4 Class III gaming consists of all forms of gaming that are not Class I or Class II gaming, 25 U.S.C.A. 2703(8), and includes casino games, nongrand fathered banking card games, and pari-mutuel horse racing. While Congress concluded that Class I and Class II gaming would be subject to tribal regulation and jurisdiction, Congress looked to the states to help regulate Class III gaming because of the States' experience in regulating Class III gaming.
¶ 5 Class III gaming, accordingly, is legal on Indian land only if, in addition to other requirements:
 1. The gaming activity is "located in a State that permits such gaming for any purpose by any person, organization, or entity;" and
 2. It is "conducted in conformance with a Tribal-State Compact entered into by the Indian tribe and the State."
25 U.S.C.A. 2710(d)(1) (emphasis added).
¶ 6 In deciding on the mechanism of a Tribal-State Compact for conducting Class III gaming, Congress noted that, "there is noadequate Federal regulatory system in place for class III gaming, nor do tribes have such systems for the regulation ofclass III gaming currently in place. Thus a logical choice is to make use of existing state regulatory systems . . . use ofstate regulatory systems can be accomplished through a negotiatedcompact." S. Rep. No. 100-446, 100th Cong. 2d. Sess., at 15(1988) (emphasis added).
¶ 7 In commenting on the Act's Tribal-State compacting mechanism, and the role of a State regulatory system in that context, Representative Anthony Coelho spoke of the ever present dangers posed to high-stakes gambling by the criminal element, and noted the past inabilities of the Federal and Indian governments to deal with these dangers:
 Despite the vast amount of experience and resources that the States devote to the regulation of non-Indian horse racing and other high stakes gambling, the pressure from criminal elements remains constant and strong. There is good reason to believe that similar gambling activity on Indian reservations would be subject to similar pressures. But there is also good reason to doubt that many Indian tribes, lacking in experience and resources, would be able to effectively regulate high-stakes gambling. And the checkered history of Federal Indian programs makes it impossible to believe that any sort of Federal regulatory system would be successful.
Cong. Rec. H8155 (daily ed. Sept. 26, 1988) (statement of Rep. Coelho) (emphasis added).
¶ 8 Perhaps one of the better explanations of the need for State regulation under a Tribal-State Compact was made by Representative James Bilbray of Nevada, who spoke in support of the Act:
 Class III games are complex and easily corrupted without constant vigilance by trained and experienced regulators.
 Those States that now permit such gaming already have in place tested regulatory programs and trained programs.
 The expertise and experience these States have
acquired over the years cannot be readily replicated by the Indian tribes or by regulatory contractors to the tribes.
 A Federal commission would not have the money, manpower, or expertise necessary to regulate
class III games.
 The States have a strong interest in regulating all class III gaming activities within their borders — the vast majority of consumers of such gaming on Indian lands would be non-Indian citizens of the State and tourists to the State. Similarly, most operators of class III games would be non-Indians
with previous experience in such gaming.
 The States have a constitutional responsibility to protect their citizens from harm, here in the form of fraudulent manipulation by the operators of the games and of victimization by criminal elements that may infiltrate the legal games operated on Indian land. A State's citizenry has a right to be treated fairly in any commercial activity, whether provided by Indians or non-Indians.
* * * *
 The imposition of a State regulatory scheme on class III games operated on Indian lands would enhance
both the appearance and the fact of integrity in the operation of the games."
Cong. Rec. H8157 (daily ed. Sept. 26, 1988) (statement of Rep. Bilbray) (emphasis added).
3. Tribal-State Compacting Mechanism
¶ 9 It was because of the need for the expertise and experience of State regulators that the IGRA did not provide for or evencontemplate the conduct of Class III gaming in the absence of aTribal-State Compact. As Senator Inouye (one of the chief Senate proponents of the Act) stated, "The Act does not contemplate anddoes not provide for the conduct of Class III gaming activities on Indian land in the absence of a Tribal-StateCompact." Cong. Rec. S12650 (daily ed. Sept. 15, 1988) (statement of Sen. Inouye) (emphasis added). Noting this, Senator Inouye further stated that tribes that choose to engage in Class III gaming may do so only if a compact is in place:
 Under this provision, tribes that choose to engage in gaming may only do so if they work out a tribal-state compact with the State. Tribes that do not want any State jurisdiction on their lands are precluded from operation of what the bill refers to as class III gaming.
Id. (Emphasis added.)
¶ 10 Under the Act's dictates, upon receiving a tribe's request to compact, the State "shall negotiate with the Indian tribe in good faith to enter into such a compact."25 U.S.C.A. 2710(d)(3)(A). If a State fails to negotiate with the tribe, or fails to negotiate in good faith, the tribe may bring an action in federal district court.[1] 25 U.S.C.A. 2710(d)(7)(A)(i). Court actions, however, may not be initiated until 180 days after the date on which the tribe requests the State to enter into negotiations. 25 U.S.C.A. 2710(d)(7)(B)(i)
¶ 11 The Act nowhere, however, requires that a compact be concluded during that 180-day period. If the Court finds that the State has either refused to enter into negotiations, or has not negotiated in good faith, the Court "shall order the State and the Indian Tribe to conclude a compact within a 60-day period."25 U.S.C.A. 2710(d)(7)(B)(iii).
¶ 12 In determining whether a State has negotiated in good faith, the Court may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impact on existing gaming activities. Id.
 III.
THE PROPER SCOPE OF A TRIBAL-STATE GAMING COMPACT IS LIMITED TOGAMING ACTIVITIES WHICH ARE LAWFULLY PERMITTED IN THE STATE INWHICH THE GAMING WILL BE CONDUCTED
¶ 13 Under the provisions of 25 U.S.C.A. 2710(d)(1), Class III gaming activities are legal on Indian land only if such Class III gaming activities are 1) authorized by tribal ordinance or resolution, 2) conducted in accordance with a Tribal-State Compact, and 3) "located in a state that permits such gaming forany purpose by any person, organization or entity[.]" Whether pari-mutuel wagering on horse-racing at other than a race tracklocation is a proper subject of a Tribal-State Compact between the State of Oklahoma and federally recognized Indian tribes thus depends on whether, under Oklahoma law, such gaming activity is permitted for any purpose by any person, organization or entity.
¶ 14 A similar restriction is imposed upon tribes wishing to conduct Class II gaming, even though compacts are not involved. Under the provisions of 25 U.S.C.A. 2710(b)(1)(A), an Indian tribe may engage in a Class II gaming activity within its jurisdiction if "such Indian gaming is located within a Statethat permits such gaming for any purpose by any person,organization or entitle and such gaming is not otherwisespecifically prohibited on Indian land by Federal law)."
¶ 15 The Act's legislative history indicates that the Senate committee reporting on the Act anticipated that the Federal courts would:
 [R]ely on the distinction between state criminal laws which prohibit certain activities and the civil laws of a state which impose a regulatory scheme upon those activities to determine whether Class II games are allowed in certain states. This distinction has been discussed by the federal courts many times, most recently and notably by the Supreme Court in Cabazon.[2]
S.Rep. No. 100446, 100th Cong. 2d Sess., at 6 (1988).
¶ 16 In interpreting IGRA, the Federal courts have found this legislative history regarding the meaning of the phrase a "within a state that permits such gaming for any purpose by anyperson, organization, or entity," in the context of Class II gaming, to be instructive in the context of Class III gaming.E.g., Mashantucket Pequot Tribe v. State of Connecticut,913 F.2d 1024, 1029-30 (2d Cir. 1990). Accordingly, in determining whether the gaming you inquire about — off track pari-mutuel wagering on horse racing — is permitted in Oklahoma, we will do so in light of the dichotomy between criminal/prohibitory laws and civil/regulatory laws.
¶ 17 The first major discussion of the dichotomy between criminal/prohibitory laws and civil/regulatory laws by the United States Supreme Court took place in Bryan v. Itasca County,426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). The primary issue addressed in the case was whether the grant of civil jurisdiction to the states, conferred by 4 of Public L. 280, 67 Stat. 589, 28 U.S.C. 1320, was a congressional grant of power to the states to tax reservation Indians, except insofar as taxation is expressly excluded by the terms of the statute. 426 U.S. at 375.
¶ 18 Public Law 280, which conferred on listed states jurisdiction on Indian land over both criminal offenses and civil causes of action, arose out of Congress' concern over the problem of lawlessness on certain Indian reservations and the absence of adequate tribal institutions for law enforcement.426 U.S. at 379. Section 4(a) of Public Law 280, 28 U.S.C.A. 1360(a), provided that each of the listed states would have jurisdiction "over civil causes of action between Indians or to which Indiansare parties which arise in the areas of Indian country . . . tothe same extent that such State . . . has jurisdiction over othercivil causes of action, and those civil laws of such State . . .that are of general application to private persons or privateproperty shall have the same force and effect within such Indiancountry as they have elsewhere within the State."
¶ 19 In exercising this a civil jurisdiction," Itasca County, Minnesota, attempted to impose a personal property tax on mobile homes of tribe members located in Indian Country. In holding that the civil jurisdiction conferred by section 4 did not include the power to impose such a tax, the Supreme Court found that section 4 was primarily intended "to redress the lack of adequate Indianforums for resolving private legal disputes between reservationIndians, and between Indians and other private citizens, bypermitting the courts of the States to decide such disputes," and that section 4 "authorizes application by the state courtsof their rules of decision to decide such disputes."426 U.S. at 383-384.
¶ 20 In concluding that Public Law 280's grant of "civil" law jurisdiction to the states did not include the power to tax, the Court found that the statute did not confer general regulatory power over Indians:
 [I]f Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so.
426 U.S. at 390.
¶ 21 Some eleven years later in the case of California v.Cabazon Band of Indians, 480 U.S. 202, 107 S.Ct. 1083,94 L.Ed.2d 244 (1987), the United States Supreme Court once again examined the distinction between civil/regulatory law and criminal/prohibitory law, again in the context of Pub.L. 280. InCabazon, the Court was called upon to determine whether the State of California, under the "civil" jurisdiction conferred by Pub.L. 280, could enforce its state bingo laws against the Cabazon Band Tribe. In essence, California's laws limited legal bingo to charitable bingo, conducted by charitable organizations which used the funds earned for charitable purposes, and limited the prizes to $250.00 per game. Under California's code, violation of any of these limitations was a misdemeanor.
¶ 22 In determining whether California could enforce its bingo laws on Indian land, the United States Supreme Court, referring to its decision in Bryan v. Itasca County, noted that it had interpreted section 4 of Pub.L. 280 to grant states jurisdiction over private civil litigation involving reservation Indians, and not to grant general civil/regulatory authority to the states. Based on this premise, the Court reasoned that "when a Stateseeks to enforce a law within an Indian reservation under theauthority of Pub.L. 280, it must be determined whether the lawis criminal in nature, and thus fully applicable to thereservation under 2 the section of Pub.L. 280 which conferscriminal jurisdiction upon the States, or civil in nature, andapplicable only as it may be relevant to private civil litigationin state court." 480 U.S. at 208. Then, referring to lower federal district court cases decided since Bryan v. ItascaCounty, the Supreme Court noted that those lower courts had drawn a distinction between states' "criminal/prohibitory" laws and states' "civil/regulatory" laws:
 [T]he Court of Appeals drew a distinction between state "criminal/prohibitory" laws and state "civil/regulatory" laws: if the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy.
480 U.S. at 209 (emphasis added).
¶ 23 The Court next concluded that it was "persuaded that theprohibitory/regulatory distinction [drawn by the lower courts] isconsistent with Bryan's construction on Pub.L. 280".n480 U.S. at 210.
¶ 24 Applying this test to the finding of the Court of Appeals below, the Cabazon Court affirmed the Court of Appeals' conclusion that the bingo laws were civil/regulatory rather than criminal/prohibitory. In so ruling, however, the Supreme Court noted that the distinction between these two categories is not a bright line rule and that the Court was giving deference to the lower court's conclusion, as it was reluctant to set it aside:
 It is not a bright-line rule, however; and as the Ninth Circuit itself observed, an argument of some weight may be made that the bingo statute is prohibitory rather than regulatory. But in the present case, the court reexamined the state law and reaffirmed its holding in Barona, and we are reluctant to disagree with that court's view of the nature and intent of the state law at issue here.
480 U.S. at 210.
¶ 25 Because the Supreme Court noted in Cabazon that an argument of some weight may be made that California's bingo statutes were prohibitory rather than regulatory, Cabazon does not stand for the proposition that all statutes similar to California's statutes will be civil/regulatory. Given the Supreme Court's reluctance to disagree with a lower court's ruling on the nature of the state's statute, it seems clear that had the courts below in Cabazon found persuasive the weighty case in favor of the statutes being prohibitory, the Supreme Court would have affirmed that ruling, as the test applied is "not a brightline" test.
¶ 26 In affirming the conclusion below that California statutes were regulatory rather than prohibitory, the Supreme Court noted that "there is surely a fair basis" for this conclusion. Id. The fair basis referred to was the structure of the California statutes themselves. Concluding its discussion of those statutes, the Supreme Court stated:
 In light of the fact that California permits a substantial amount of gaming activity, including bingo, and actually promotes gaming through its state lottery, we must conclude that California regulates rather than prohibits gaming in general and bingo in particular.
240 U.S. at 211.
¶ 27 Some federal courts have mistakenly construed the Supreme Court's statement: "[W]e must conclude that California regulatesrather than prohibits gaming in general and bingo inparticular," as holding that all of a state's gaming laws must be viewed as regulatory, unless the state prohibits all forms of gaming. E.g. Lac du Flambeau Indians v. State of Wis.,770 F.Supp. 480, 485 (W.D.Wis. 1991). In Lac du Flambeau, the District Court found that the state's position that the IGRA only required a state to compact regarding gaming that was legally operated in the state, was in error. The Court reasoned that if "the state policy is to prohibit all forms of gambling byanyone, then the policy is characterized ascriminal-prohibitory." 770 F.Supp. at 485. On the other hand, the Court held, "if the state allows some forms of gambling . . .its policy is deemed to be civil-regulatory." Id. What this mistaken analysis ignores is a further discussion in theCabazon case itself. The above-quoted language is followed immediately by a footnote that specifically explains that the applicable state laws "governing an activity" must "beexamined in detail before they can be characterized as regulatoryor prohibitory." The Supreme Court then noted, in the same footnote, that "the lower courts have not demonstrated aninability to identify prohibitory laws":
 For example, in United States v. Marcyes, 557 F.2d 1361, 1363-1365 (C.A.9 1977), the Court of Appeals adopted and applied the prohibitory/regulatory distinction in determining whether a state law governing the possession of fire-works was made applicable to Indian reservations by the Assimilative Crimes Statutes, 62 Stat. 686, 18 U.S.C.A. 13, 18 U.S.G.S. 13. The Court concluded that, despite limited exceptions to the statute's prohibition, the fire-works law was prohibitory in nature.
480 U.S. at 211.
¶ 28 Thus we see that in approaching a regulatory/prohibitory question, the Supreme Court indicates that we look at "anactivity." We also see that the laws governing "an activity" must be examined in detail before they can be characterized as regulatory or prohibitory. The less detailed analysis of the Lacdu Flambeau opinion is not an analysis dictated or even fairly supported by the Cabazon decision. Indeed, use of the Lac duFlambeau "all-or-none" analysis would result in absurdities. For example, using such an analysis, clearly prohibitory criminal laws such as those against drug possession would be viewed as civil/regulatory, if a state permitted doctors to prescribe narcotics.
¶ 29 The Lac du Flambeau "all or none" analysis is also misguided because it ignores a central purpose of the Indian Gaming Act — a central purpose which grew out of Congress' recognition that neither the federal government nor the tribes had the experience, expertise or regulatory infrastructure necessary to regulate Class III gaming. Based on this recognition, it was the intent of Congress in the Act to take advantage of the "tested regulatory programs, that exist inthose states that now permit such gaming." Cong. Rec. H 8157 (Daily Ed. Sept. 26, 1988) statement of Rep. James Bilbray. In states in which most Class III gaming is outlawed, but some types of Class III gaming are permitted, the state's regulatory expertise, experience and infrastructure may exist for that one form of gaming, but not for the prohibited forms. For example, in a state that permits only pari-mutuel horse racing, there will be no expertise, infrastructure, or experience in regulating casinos because casino gaming is not permitted in the state. Under theLac du Flambeau "all or none" rationale, the state would nevertheless be required to permit casino gaming, in spite of the fact that there was no regulatory experience or infrastructure to regulate such gaming. Thus, the Lac du Flambeau "all or none" analysis is inconsistent with the IGRA's intention to make use of existing state regulatory infrastructures.
¶ 30 As the Court of Appeals for the 9th Circuit noted inUnited States v. Marcyes, 557 F.2d 1361, 1364 (9th Cir. 1977), a statutory scheme may be properly viewed as criminally prohibitive even though it allows for limited exceptions. InMarcyes, there were narrow exceptions to the state's general prohibitions against possessing and using fireworks. Indeed, theMarcyes court refused to view the narrow exceptions to the prohibitions as converting the state's treatment of an activity to a regulatory treatment. Such a construction, the Court stated, would "circumvent" the public policy of the state as allowing the operation of fireworks stands "on the reservation or in anyfederal enclave would entirely circumvent Washington'sdetermination that the possession of fireworks is dangerous tothe general welfare of its citizens." 557 F.2d at 1364.
¶ 31 It was not the intention of the United States Supreme Court decisions in Cabazon to adopt an "all or none" dichotomy like that later adopted in Lac du Flambeau. Rather, it was the intent of the Supreme Court for the courts to appraise state statutes realistically, and where the statutes prohibited an activity, to enforce that prohibition on Indian country within the state. In adopting this approach, the Supreme Court, relying on Marcyes, specifically recognized that the existence of narrow exceptions to prohibitory statutes does not alter their prohibitory nature.
¶ 32 The forms of gaming which are licensed and regulated within a state are proper subjects of Class III Tribal-State Compacts. On the other hand, those forms of gaming which are prohibited are not proper subjects of Tribal-State Gaming Compacts, as such forms of gaming are contrary to state public policy. An analysis of Oklahoma's gaming laws under the Cabazon
regulatory/prohibitory dichotomy leads us to conclude that Oklahoma's gaming laws are generally prohibitory.
 IV. OKLAHOMA'S PERVASIVE ANTI-GAMING PROHIBITORY LAWS
1. General Anti-gambing Prohibitory Laws
¶ 33 The criminal statutes of Oklahoma prohibit almost every form of gambling. The statutes prohibit "poker, roulette, craps, or any banking or percentage, or any gambling game played with dice, cards, or any device, for money, checks, credits, or any representatives of value." 21 O.S. 941 (1991).
¶ 34 Also prohibited is the placing of a bet or the playing of any game whatsoever for money, property, checks, credits, or other representatives of value with cards, dice, or any other device which may be adapted to, or used in playing any game of chance or in which chance is a material element. 21 O.S. 942
(1991).
¶ 35 Further, the ownership of anything suitable to be used for gaming purposes, or furniture or equipment used in a place conducted in violation of the gaming laws, requires forfeiture of the equipment. 21 O.S. 943, 21 O.S. 960, 21 O.S. 973 (1991).
¶ 36 Persons who permit gaming in their building or on their grounds, or knowingly lease their property for such purposes, are also guilty of a crime, 21 O.S. 956 — 21 O.S. 957 (1991), and the leases are declared void under Oklahoma law. 21 O.S. 958
(1991).
¶ 37 The criminal statutes of Oklahoma also provide that operating any house, room, or place where any of the prohibited games are conducted or carried on is a felony. 21 O.S. 946
(1991). More specifically, persons in charge of any cigar stand, hotel lobby, store, or like place that permits the playing of dice or any other games, schemes, or devices of chance have committed a crime. 21 O.S. 947 (1991).
¶ 38 The setting up, operation or conducting of a slot machine is also prohibited. 21 O.S. 970 (1991). Some tribes have suggested Oklahoma, in permitting the ownership of antique slot machines (machines twenty-five years or older) when "Inapt used for gambling purposes," evidences a public policy favoring Class III gaming. This argument neglects to note, however, that the very statute which permits the ownership of antique slot machines only permits ownership for non-gaming purposes. 21 O.S. 964
(1991).
¶ 39 The anti-gaming statutes of Oklahoma also specifically prohibit punch boards and declare them to be a public nuisance.21 O.S. 971-973.
2. Criminal and Civil Sanctioning of Law Enforcement OfficersWho Either Violate or Fail to Enforce Oklahoma's Anti-gamingLaws.
¶ 40 Oklahoma's pervasive anti-gaming public policy is further demonstrated by the stiff penalties imposed upon any state, district, city, town, or county officer who engages or participates in or assists or encourages any other person in any kind of gambling. Law enforcement officers who violate the anti-gaming laws commit a felony punishable by fines up to$10,000 and imprisonment for up to ten years. Furthermore, upon conviction, those officers immediately forfeit theiroffices and are forever disqualified from holding any office
of profit or trust in the State of Oklahoma. 21 O.S. 948
(1991).
¶ 41 District attorneys, sheriffs, constables, police officers and all other peace officers and law enforcement officers are required to enforce the antigaming laws of Oklahoma; any officer who knowingly or willfully neglects or fails to enforce the anti-gaming laws is subject to removal from office, and upon conviction, is disqualified from holding any office of trust or profit in the State of Oklahoma for two years. 21 O.S. 949
(1991). Law enforcement officers are also prohibited from receiving consideration for protection against arrest or conviction of anti-gaming laws; any officer who violates the prohibition commits a felony. 21 O.S. 950 (1991).
¶ 42 In addition, sheriffs, police officers, constables, and county prosecuting officers have a duty to inform against and prosecute all persons who they believe violate the gaming statutes of Oklahoma. 21 O.S. 962 (1991). Officers who fail to perform this duty are guilty of a crime.
¶ 43 The anti-gaming laws once again, at 21 O.S. 974-976,
impose upon officers the duty to enforce anti-gaming statutes. Those laws also establish an evidentiary presumption that a slot machine or punch board set up, operated, conducted, displayed or exposed in a public place for a considerable time is evidence that the devices are operating with the enforcement officer's knowledge. Id. This presumption may be used against the officer in prosecution for failure to perform his duties, which is a felony, the sanctions of which include ineligibility to hold any public office. Id.
¶ 44 Not only are law enforcement officers specifically required to enforce Oklahoma's anti-gaming statutes, but railroad conductors and brakemen within the jurisdiction are also empowered to enforce the anti-gaming laws. 21 O.S. 955 (1991).
¶ 45 The statutes dealing with law enforcement officers who knowingly or willfully neglect to enforce the gaming laws, or violate the gaming laws, demonstrate that Oklahoma not only prohibits gaming, but as a matter of public policy will not tolerate law enforcement officers who fail to enforce the prohibitions or who violate them themselves.
¶ 46 Some tribes have suggested that law enforcement officers who violate the law, either by failing or refusing to enforce the anti-gaming laws or by violating anti-gaming laws themselves, somehow change the State's public policy. Under this suggested analysis, any local enforcement officer, such as an inept or corrupt local official, could dictate the public policy of the State. Such, however, is not the law. This position ignores the fact that public policy is determined by the legislative branch of government, not the executive, e.g., Seminole Tribe ofFlorida v. Butterworth, 658 F.2d 310, 315-16 (5th Cir. 1981), and that only elected legislative representatives of the people in conjunction with the Governor may determine the public policy of the State. See, generally, Okla. Const. Article V, e.g., Cityof Sand Springs v. Dept. of Pub. Wel., 608 P.2d 1139, 1144
(Okla. 1980).
3. Anti-Commercial Gambling and Anti-Lottery Laws
¶ 47 Under a broad definition, "commercial gambling" is specifically prohibited. 21 O.S. 981 — 21 O.S. 982. Like Oklahoma's other anti-gaming laws, its laws outlaw the use of property and premises for commercial gambling purposes. 21 O.S.983 (1991). Also outlawed is dealing in gambling devices, 21O.S. 984 (1991), and the possession of gambling devices, 21O.S. 985 (1991). The installation of communication devices for gambling, 21 O.S. 986 (1991), and the dissemination of gambling information, 21 O.S. 987 (1991), are also outlawed.
¶ 48 A "lottery" which encompasses any scheme for the disposal or distribution of property by chance among persons who have paid or promised to pay valuable consideration, is prohibited except under very narrow circumstances (See discussion, infra). 21 O.S. 1051 (1991) et seq. As with other anti-gaming statutes, use of a location for a lottery is prohibited, 21 O.S. 1063 (1991), and property involved is subject to forfeiture. 21 O.S. 1062 (1991).
4. Narrow Exceptions to Oklahoma's Pervasive Anti-GamblingPublic Policy
¶ 49 There are only two limited exceptions to Oklahoma's anti-gambling policy.[3] The first exception is pari-mutuel horse racing, including both ontrack wagering, 3A O.S. 200
(1991) et seq., and simulcast wagering, 3A O.S. 205.7 (1991). Pari-mutuel horse race wagering is highly regulated, and, since virtually all other forms of Class III gaming are prohibited in Oklahoma, pari-mutuel horse race wagering is the only gaming in Oklahoma for which the State has an established and experienced regulatory infrastructure.
¶ 50 The only other exception to Oklahoma's anti-gaming statutes is raffle type lotteries. Under the provisions of 21O.S. 1051 (1991), a raffle-type lottery may be conducted by: 1) a bonafide resident merchant acting in conjunction with the chamber of commerce or a commercial club, with the merchant issuing "free of charge" numbered tickets on sales of merchandise and 2) by a bonafide community chest welfare fund on a military post or reservation, which is permitted to issue numbered tickets in conjunction with voluntary contribution to the fund, provided that no tickets may be sold or contributions received off the post or reservation.
5. General Prohibitory Nature of Oklahoma's Gaming Laws
¶ 51 Oklahoma's gaming laws, as shown above, are pervasively prohibitory. The public policy of the State as expressed in those statutes not only prohibits almost every form of gaming, but does so by making it a crime to engage in such activities. Accordingly, we conclude that Oklahoma's gaming laws are generally prohibitory. There are however, as noted above, two narrow exceptions, one of which is directly related to the question presented — the exception which permits pari-mutuel horse race gambling.
 V. REGULATORY NATURE OF OKLAHOMA'S PARI-MUTUEL HORSE RACING GAMBLING LAWS
¶ 52 The Oklahoma Horse Racing Act, 3A O.S. 200 (1991) et seq., licenses and regulates both those who operate race tracks (organization licensees), 3A O.S. 205 (1991), and those employed in the racing industry (occupation licensees), 3A O.S.204.2 (1991), as amended.
¶ 53 Part of the regulation of pari-mutuel horse race gaming requires that the pari-mutuel system of wagering shall be permitted only on horse races conducted at a race track where such pari-mutuel system of wagering is authorized under the provisions of the Act. 3A O.S. 205.6(A) (1992). Oklahoma statutes also allow on-track simulcast wagering — wagering at an organization licensee's track on the results of feature races conducted elsewhere, but simultaneously telecast at the organization licensee's track. Such simulcasting is only permitted under specific circumstances. For example: 1) simulcast wagering on out-of-state feature races may take place only if the gross purse for the feature race exceeds $100,000; 2) wagers on simulcast races are placed in a separate pari-mutuel betting pool; and 3) all the provisions of the Interstate Horse Racing Act (15 U.S.C.A. 301 et seq.) are complied with. 3A O.S.205.7 (1991). In all instances, simulcast wagering, inOklahoma, must take place at an organization licensee's racetrack.
¶ 54 The question you pose is whether the State may enter into a Tribal-State Gaming Compact under which the tribe may conduct pari-mutuel horse race wagering at other than a racetracklocation. As noted above, the answer to this question depends on whether Oklahoma permits "such gaming for any purpose by anyperson, organization or entity" as that phrase is used in section 2710(d) of the IGRA. Whether such gaming is "permitted," depends on whether the gaming activity is criminally prohibited or merely civilly regulated.[4]
¶ 55 The Lac du Flambeau "all-or-none" analysis would construe the phrase "such gaming" to simply mean gambling: under its analysis a state which permitted any gambling would be deemed to permit all gaming. This broad definition of "suchgaming" is inconsistent with the IGRA's intent to use existing state regulatory infrastructure, experience and expertise, in regulating Indian gaming. As noted above, Congress looked to the States — through Tribal-State Compacts — to aid in the regulation of Class III gaming because, "there is no adequate federalregulatory" system in place for Class III gaming, nor do tribeshave such systems for the regulation of Class III "gamingcurrently in place." S.Rep. No. 100-446, 100th Cong.2d Sess., at 15 (1988) (emphasis added). Under Lac du Flambeau's
"all-or-none" analysis, a state would be required to compact for the regulation of gaming activities which a state outlawed, for which the state had no regulatory system in place and with which the state had no regulatory experience or expertise. For example, under Lac du Flambeau's analysis, a state which only allowed wagering on horse racing would be required to compact for casino gaming regardless of the fact that the activity was illegal and the state knew nothing about regulating casino games.
¶ 56 The "all-or-nothing" approach of Lac du Flambeau would not only require compacts in areas in which a state had no experience, it would also alter the state's public policy by requiring a state to permit outlawed gaming within its borders. Both of these effects are contrary to the IGRA's intent; IGRA sought not to alter a state's gaming law policies, nor to require compacting where the state outlawed a form of gaming. For these reasons we do not subscribe to the Lac du Flambeau broad "all-or-nothing" construction of "such gaming."
¶ 57 Rather, we construe "such gaming" to require an analysis of what "games" a state law specifically authorizes to be legally played. If a specific "game" is not legally permitted in a state, it is not the proper subject of a compact.
¶ 58 In the context of your question, the "game" you refer to, pari-mutuel horse race gambling, is a form of gaming legally permitted in Oklahoma, and for which regulatory experience, expertise and infrastructure exists. The public policy of the state as set forth in title 3A specifically permits this type of gaming, and thus Oklahoma statutes regarding such gaming are civil/regulatory in nature. Accordingly, under a Cabazon
analysis, pari-mutuel horse race wagering would be a proper subject of a Tribal State gaming compact, and the state, under the IGRA, is required to treat it as a proper subject of a Tribal-State gaming compact.
¶ 59 Under a Cabazon analysis, if a State's laws generally permit the conduct at issue even though the state regulates the activity, the laws must be classified as civil/regulatory and the enforcement of such state civil/regulatory laws on Indian land is not authorized. See 480 U.S. at 209. Thus under a Tribal-State compact, a tribe would not be bound by the State's existing statutory regulations, unless such regulations, or parts thereof, were made applicable to gaming on Indian land in the compact itself. 25 U.S.C.A. 2710(d)(5). Examples of civil/regulatory laws governing horse racing in Oklahoma include such things as limits on the types of wagers that can be placed, and when wagers can be placed. Oklahoma's civil/regulatory horse racing laws also limit the locations at which wagering may take place. The mere fact that Oklahoma's regulatory statutes do not allow wagering at other than a race track location does not mean that such wagering is not "permitted," as that term is used in the IGRA. Since pari-mutuel horse racing is permitted under Oklahoma law, Oklahoma is required to treat pari-mutuel horse race gambling as a proper subject of a Tribal-State compact and thus may not refuse to negotiate regarding such gambling on the basis that it is to be located at other than a race track location.[5]
¶ 60 The fact that Oklahoma must treat pari-mutuel horse race wagering as a proper subject of a Tribal-State compact, however, does not by any means imply that the State is without power to include in a compact adequate provisions for the protection of its citizens against the dangers sometimes associated with gaming enterprises. The same reasons that a State develops a civil/regulatory law to oversee pari-mutuel horse race wagering on non-Indian lands apply to such gaming anywhere else within the State's borders. As previously discussed, the legislative history of the IGRA recognizes the State's strong interests in protecting its citizens. In urging his colleagues to support the Act, Representative James Bilbray specifically addressed the States' interests in ensuring that Class III gaming within its borders was adequately regulated:
 The States have a strong interest in regulating all class III gaming activities within their borders — the vast majority of consumers of such gaming on Indian lands would be non-Indian citizens of the State and tourists to the State. Similarly, most operators of class III games would be non-Indians with previous experience in such gaming.
 The States have a constitutional responsibility to protect their citizens. . . . A State's citizenry has a right to be treated fairly in any commercial activity, whether provided by Indians or non-Indians.
Cong. rec. H. 8157 (Daily Ed. September 26, 1988) (Statement of Rep. Bilbray).
¶ 61 The State may therefore work with the tribe, through the compacting procedure, to ensure that the regulation of gaming activity (whether the regulation is to be provided by the State or the tribe, or both) includes such things as background investigations of those who are to manage, run, or regulate the gaming activity; licensing procedures; bonding requirements; economic feasibility study requirements, and designation of appropriate forums in which breach of contract, tort, or other actions may be brought against the gaming operators. Additionally, compacts may include provisions relating to the facilities at which Indian gaming is to take place, such as provisions dealing with safety, fire and construction standards.
¶ 62 Importantly, the Act also itself recognizes that in negotiating a compact, the State may take into account the adverse economic impact which compact gaming may have on existing gaming. 25 U.S.C.A. 2710(d)(7)(B)(iii)(I).
¶ 63 Thus, even though the State is required to treat pari-mutuel horse race wagering as a proper subject of a Tribal-State compact, the State through negotiations, can nevertheless provide for the protection of its citizenry and the economic viability of existing race tracks
¶ 64 It is, therefore, the official opinion of the AttorneyGeneral that Oklahoma's gambling laws are generallycriminal/prohibitory laws, 21 O.S. 941 — 21 O.S. 993 (1992)and 21 O.S. 1051 — 21 O.S. 1063 (1992). Oklahoma's publicpolicy, however, does not prohibit pari-mutuel horse racegambling. Rather, it permits such gaming, subject to strict stateregulation. 3A O.S. 200 — 3A O.S. 209 (1992). Becausepari-mutuel horse race gambling is permitted in Oklahoma, theIndian Gaming Regulatory Act, 25 U.S.C.A. 2701 et seq., requiresthe State to treat such gambling as a proper subject of aTribal-State compact, regardless of whether the wagering on horseracing occurs at the site of the race or at other than a racetrack location.
 Although the Indian Gaming Regulatory Act requires Oklahoma totreat pari-mutuel horse race wagering as a proper subject ofnegotiation, Oklahoma, in negotiating, may take into account thefinancial integrity and adverse economic impact which this gamingmay have on existing gaming operations.
 The state may also, through the compacting procedure,negotiate for such regulations and oversight provisions as itdeems necessary to protect the public interest and public safetyof the citizens of this state.
 Attorney General Opinion No. 89-041, which reached conclusionscontrary to those contained herein, is withdrawn.
SUSAN BRIMER LOVING ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL
[1] There is a serious question whether Congress can compel the States to negotiate a compact or be subject to the District Court's jurisdiction or its imposed "compacting" or "mediation" without violating the states' 10th Amendment rights and 11th Amendment immunities. These questions, which are being litigated in courts across the country, are not addressed in this opinion.
[2] California v. Cabazon Band of Indians, 480 U.S. 202,107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).
[3] For the purposes of the discussion here, charitable bingo and related charitable Class II games are not considered, as they are irrelevant to the compacting provisions of IGRA, which only deal with class III games.
[4] As we find that both under Cabazon's
regulatory/prohibitory dichotomy and a plain interpretation of the IGRA the same result would obtain, we need not determine today which of these two analyses is more appropriate.
[5] In Attorney General Opinion No. 89-041, the analysis used viewed the State's regulatory location restriction as a criminal/prohibitory law. Thus, that opinion came to the wrong conclusion. Accordingly, we must withdraw Attorney General Opinion No. 89-041.